## UNITED STATES v. STEPHENS.
### No. 7405.

Circuit Court of Appeals, Ninth Circuit.
Nov. 13, 1934.

J. A. Carver, U. S. Atty., E. H. Casterlin and Frank Griffin, Asst. U. S. Attys., and R. L. Slaughter, Atty., Department of Justice, all of Boise, Idaho, and Wilbur C. Pickett, Sp. Asst. to the Atty. Gen.

E. M. Wolfe, of Twin Falls, Idaho, for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from a judgment against the government upon a policy of war risk insurance. The assignments of error relate to rulings upon the admissibility of evidence, to the ruling of the court denying appellant's motion for directed verdict, and to the refusal of the court to give an instruction requested by the defendant. The first three assignments relate to the admissibility of the testimony of a physician as to whether or not in the opinion of the witness the veteran was totally and permanently disabled. In view of the importance of the question, we state the entire question, objection, and answer, and include the testimony of the physician, Dr. John R. Morgan, concerning the conditions which he found in his examination, which conditions were included in the hypothetical question by reference:

"I am a graduate of Northwestern University and have practiced over 25 years at Twin Falls in a general practice. I am acquainted with the plaintiff and have treated him. I commenced to treat him in the fall of 1928 when he came to me with trouble in breathing and a bad cough.

"Q. Did you make an examination of him? A. I examined him, his throat, head and nose and found an enormous amount of infection in the throat and nose, which could have predicated the cough. Following that time or around about that time I took Bennie into the room and had him stripped down to his waist and my observations there were of a man that was thin, poor, his spaces above and below the clavicular were very much thickened. His face was very red and synotic also his arms and feet. The respiratory center was rather abrupt. He was very round shouldered and stooped. His breathing was labored. I would have him take a long breath and it would produce a spasm of coughing. It was a hoarse cough and came in spasms very much like a whooping cough. He would almost get out of breath. It was a productive cough and he would raise a lot of sputum with that cough. I have seen, in my estimate in having him cough, he pos·

sibly would raise a teacup of sputum at each cleaning. Do you want me to continue with my full physical examination of this man?

"At a later time I think I went farther. I would say I have been his family physician since that time. He has been in my office on and off ever since. I have treated him. I think in the fall of 1930 or 1931 I made a physical examination of the plaintiff.

"Q. What were your findings on that examination? A. The findings of his chest was much like he had when he first come, but in the abdomen particularly when he was coughing, Bennie would wear a truss, and when he would cough it would produce a couple of lumps—a lump in each groin. These I interpreted to be a rupture produced by excessive coughing. This sputum he was spitting up was examined and found to be negative for T. B. but had an enormous lot of pus cells and it would indicate that the tissues and cells were being destroyed. There was also some blood in the sputum. There was a lot of râles through the base of his chest and more prominent in the left side; that is they extended higher. There was bronchial breathing and I had some x-ray pictures taken—

"Mr. Dawson: Just a minute. Did you take those pictures yourself?

"A. I took him to the laboratory and had him stripped right down and the technician there took the x-rays under my supervision and observation. The x-ray findings verified my physical findings. The bronchial tree and tubes of this man showed up in the x-ray picture about as plain as I have ever seen them show up when we have the stuff in them to take an x-ray picture. They showed up white fibrosis according to my interpretation of the bronchial tree. There were a few of the lymph nodes that were calcareous and showed up in the x-ray.

"Q. Now, Doctor, what effect upon a man's physical well being do these findings indicate? A. To my mind these findings incapacitate this man and put him in the class of total and permanent disability for labor, for work.

"Q. In what way do they affect him—how effect that result? A. There are several ways. We know from these findings that the blood stream that carries the blood and nutrition to the body is deprived of carrying it to the body, of carrying oxygen to the body.

"Q. What effect upon a man's ability to act does the failure of the body to get the needed oxygen have? A. Well I would illus-trate it like this. If you were placed in a small room and all the oxygen taken out of the room—it would be something like that, you couldn't get enough oxygen to keep on breathing with. This man is being starved for want of oxygen. That destroys his vitality, his endurance, his alertness. The breathing would probably be more rapid, more irregular. It would probably be nature calling for more oxygen.

"Q. What in your judgment produces this violent coughing? A. The enormous amount of infection that this man was having in his nose and throat and bronchial tubes and besides that the destruction of those tissues as well as the fibrous formation around the bronchial tree and tubes to the lungs. This patient, the slightest irritation would produce the cough and expectoration. It clears off those waste products and you can secure a little more oxygen.

"Q. In the condition in which you found this plaintiff in 1928 state whether or not he was able to perform continuously any kind of labor? A. In my opinion he was not able to continuously carry on any labor that created any exertion to amount to anything.

"Q. What would you say as to his condition at the present time in that respect? A. I would say he is probably getting worse every year.

"Q. Doctor, you may assume that the plaintiff in this action, Benjamin F. Stephens was born in Indian Territory on or about the 12th day of July, 1881; that he was raised on a farm and never did any substantial amount of work or labor except farm work up to the time he enlisted in the army, Feb. 26, 1918. That in his schooling he advanced as far as the third grade reader and now can scarcely read, neither read nor write. As a young man he entered into his service and enjoyed going to dances and such amusements, enjoyed hunting and never suffered from coughs or colds or throat or lung trouble; that he worked during the farming season of every year from the time he was old enough to work until he entered the service and received the going wages for farm work in the community in which he lived and worked. That he pitched hay and worked around threshing machines, pitching bundles to the machines. At the time he enlisted in the service he weighed 122 pounds, was 5 feet 3½ inches high; that he never suffered pain or weakness in the knees or feet and never had any trouble with his lungs or bronchial tubes. He enlisted February 26, 1918, at Twin Falls, Idaho; that on this

date before being inducted into the service, he passed a general physical examination by the government doctor who found head, chest, abdomen, extremities normal; heart normal, nose and throat normal, genito-urinary organs normal; hernia none; hemorrhoids none. Vision right eye 20/20—1; left eye 20/20x; hearing right ear normal; left ear normal; pyorrhea slight; curvature of spine slight, left. Hyperdosis slight both feet. That he went to the Fort Douglas, Utah, from Twin Falls; that while at practice throwing hand grenades he injured his thumb on the right hand which thumb still continues to give him pain; that he was not hospitalized but was marked 'quarters' and just laid around; that he remained at Fort Douglas until the last of June when he was sent to Camp Funston and then to a development camp at Fort Riley and from there to Camp Merritt, New Jersey, and thence to Brest, France, and from there to the rest camp where he stayed about a week. From there he was taken to a station back of the front and here he was under shell fire. That he was in Company 353 Ambulance corps as stretcher bearer; that about six o'clock on the morning of October 26, 1918, while he was sleeping in a cave a shell exploded within about five feet of him, a fragment of the shell striking his helmet which rested on his head with such force he thought his head was cut open and that at the same time and by the same shell he was gassed. This gas he inhaled and it also came in contact with his eyes and neck; that he was shortly thereafter taken to base hospital 35 where he was treated; that at this base hospital 35 on October 30, 1918, the hospital record shows: 'Gassed in action October 26, 1918. Diagnosis: Gas absorption of deleterious mustard, inhalation and surface contact in action.' Another report on the same day base hospital No. 8, A. E. F. shows: 'Surface contact with deleterious gas, eyes and neck'; that for about four weeks he was unable to speak above a whisper and for three weeks he could not see and was confined in the hospital and under treatment from that time until January 5, 1918, when he was taken from the hospital in an ambulance to the transport boat which took him to Fox Hill, England. He was there put again in a hospital for about a week when he was taken in an ambulance to the transport which brought him across to New York where he was conveyed in an ambulance to the train which carried him to Fort Douglas, Utah, where he remained under medical treatment until his discharge from the army May 26, 1919, except

for about two weeks just prior to his discharge when he was on a furlough at a friend's near Twin Falls, Mr. John Hollan's; that he returned from this furlough to the same hospital; that he went from the hospital at Fort Douglas at Salt Lake and down on the train to Twin Falls; that at the time of his discharge he was examined by the government doctors and this question was asked, 'Have you any reason to believe that at the present time you are suffering from the effects of any wound or injury or disability or that you have any disability or impairment of health whether or not incurred in the military service, in which he declared that the foregoing questions and my answers thereto have been read over to me and that I fully understand the questions and that the replies thereto are true in every respect and are correctly recorded; that he testifies now that he does not remember any examination of that kind taking place at that time; that the medical examination certified 'I certify that aside from his own statement I do not know nor have I any reason to believe, that the soldier who made and signed the foregoing declaration has a wound, injury or disease at the present time, whether or not incurred in the military service of the United States; that the examining doctor further certified that the soldier named above was given a thorough physical examination and it was found he was physically and mentally fit with the following exception, mustard gas, eyes and lungs October 26, 1918, Argonne Forest, France. This is the soldier's statement. The wound, injury or disease is not likely to result in death or disability. In my opinion the wound, injury or disease did originate in the line of duty in the military service of the United States. In view of occupation he is no per cent. disabled. Signed William F. Beer, Major. That while he was in the hospital at Fort Douglas the clinical record shows a variation of temperature between morning and night and on various days that would be higher in the morning than afternoon; that on the 27th day of October it shows him in bed with light diet, treated with digitalis and codeine which were given him regularly for several days. X-ray findings under date of January 22, 1923, shows moderate bronchitis with slight beading, right side above fourth rib; apices somewhat shaded. Another x-ray finding under date of February 9, 1924, gives apices shaded, marked thickening and widening of hilus with a fine network of fibrous lines extending to the periphery and occupying the middle portion of the chest with right side more marked, few

evidences toward base, angles clear; little calcification. That upon the return of the plaintiff to his home or his friend John Hollan's home in Twin Falls he coughed almost continuously; that he could not sleep and the coughing weakened him so he could not work and it woke him up most every night; that at no time has he been able to sleep on the left side; that his throat and lungs seem to fill up until he coughs or belches; that upon his return from the service he has pains in his knees and feet which continue to the present time; that at the time he entered the service he weighed 122 pounds and that he now weighs 118 pounds; that the coughing became so severe as early as 1919 or 1920 that he ruptured himself; that this rupture has now grown to a double hernia; that he was operated on for this hernia in 1920, when his appendix was removed; that the operation for the hernia was effective for about six months when it broke out again; that he has a good appetite but can eat no foods containing acids; that during the summer, fall and the winter of 1919 he first tried to put up hay but was unable to because the work made him cough and breathe hard. That he did chores around the house; that in the fall of 1919 he picked apples but found the work too heavy for him but he continued to pick and was paid by the box; that in 1920 he tried to mow his lawn but could not; that sometimes he would fall down from exertion; that in 1925 he suffered a severe hemorrhage of the lungs and was taken to the Twin Falls hospital and treated for two weeks; then to the Veterans Hospital at Boise and treated for two weeks; that frequently he spits blood; that he tried to help his brother-in-law in 1924–25 picking apples and was paid by the box but was not able to work steady; that at other apple picking seasons about 1924–25 he has picked apples, also picking by the box; that this work has exhausted him; that the only kind of manual labor that he is now doing or able to do is janitor work which exhausts him; that he frequently feels weakness in the knees and feet, making it difficult for him to stand up; that the sweeping in his janitor work makes him cough so he has to rest at times; that his wife has helped him do his janitor work and wash windows and sweep and dust; that when she does not help, at times he has had assistance from other sources; that climbing stairs exhausts him and at times when he would go to get his pay for service in taking care of the Danceland, on climbing the steps he would be so exhausted that on reaching the top he would sit down and rest before asking for his money, his pay; that a sudden explosion will excite and disturb him; that this so affects him that he stands, has to stop and regain his equilibrium; that since his return from the service he does not care to attend dances or social gatherings and does not care to hunt because of the discharge of the gun; that he goes into a rage on the slightest excuse; that his condition seems to be gradually growing worse as time goes on; that he has received aid from various persons. That a Dr. Hal Bieler, United States Public Health Service on July 13, 1920, reported the following results of a physical examination: 'A thin, small man with persistent cough. Eyes, nose, teeth and glands negative. Throat has congested appearance. Lungs show much moisture throughout and at the left base there are loud, moist râles, squeaks and groans. Supraclavicular fossae well marked, impaired resonance over both apices and at right base post. Heart regular, 72, no murmurs, sounds are distinct. Blood pressure S.100.D.70. Abdomen negative. Right inguinal hernia supported by truss. Extremities normal, no edema, urine normal. Sputum negative for T. B.' That on January 22, 1923, Dr. Ensign reported the following findings: Moderate bronchial tree with slight beading; right side up above fourth rib; apex is somewhat shaded. Right hilus broad, left side clear. Angles clear and diaphragm regular. That on February 15, 1920, Dr. Thomas—I mean Theodore Schwartz reported the following physical findings: Height 65 inches, weight 120 pounds (this is the normal average weight). Pulse sitting 70; standing 92. Temperature 98.3. Heart normal. Chest—Chest full of coarse râles, all the symptoms of chronic bronchitis present. No dullness found on apices. No signs of T. B. Abdomen and extremities normal. Burning sensation referred to left side three inches below nipple. No objective signs. States pain occurs when he is warm, and that causes extra coughing spells.

"In addition to this, consider the findings that you made and which you have placed in the record and assuming the following definition of total and permanent disability to be 'Total disability is any impairment of mind or body which makes it impossible for the disabled person to follow continuously any substantially gainful occupation and permanent disability is as follows: Total disability shall be deemed to be permanent whenever it is founded upon conditions which ren-

der it reasonably certain that it will continue throughout the life of the person suffering from it.'

"Now will you please state if in your opinion Benjamin F. Stephens was permanently and totally disabled within the meaning of the—within the foregoing meaning at the time of his discharge from the army on May 26, 1919?

"Mr. Dawson: Objected to on the ground that the hypothetical question propounded to the witness does not give a full and fair statement of the material facts in this case and according to my notion misstates some facts in that there is no evidence showing that the hernia was caused by his coughing and that there is no evidence in this case that this man fell from exhaustion while working or that he frequently spit blood, or that his work as a janitor exhausted him or that his lungs became filled with dust while working as a janitor. Furthermore the question does not state the work record of the man from 1926 to the present time fully and fairly. Secondly the question propounded to the medical witness asks for his opinion as to the ultimate fact in the case which invades the province of the jury.

"The Court: What would you say as to your statement not being a substantial statement, not including the work record up to the present time?

"Mr. Wolfe: I thought I had it fairly well. I may not have gone far enough into the different jobs he has carried on. I would like to add that to the question.

"The record shows that in 1919 or early 1920 the plaintiff performed janitor work for Mr. Lloyd for which he received $8.00 a month; that he worked in that capacity six or eight months; that about 1926 he shined shoes in the barber shop of Jerry Hunt; that in doing this he occasionally took fits of coughing, sometimes left the room and sometimes sustained himself against anything he might see and sometimes sat down; that since that time, on his return to and from other jobs he worked at he frequently goes into the shop and sits down and sometimes leans over and goes to sleep; that about 1927 he commenced doing janitor work for Mr. Dell, taking care of Danceland where he cleaned out and janitored up the building which is about 125 by 60 feet or something like that; in this work he has been engaged practically all of the time from that date until the spring of 1933, except about a year when he was not so engaged; that in this work he was assisted by his wife until about 1930;

that for this service he received $2.00 a night and part of the time $2.50; that sometimes when his wife did not assist him he was assisted by others; that in doing this work he moved around as observed by Mrs. Dell, very slowly, sometimes having severe coughing spells and sometimes this produced active breathing, heavy breathing; that many times in addition to his pay they gave him clothing and other assistance; that from 1928 until 1932 he janitored the office of Charles E. Potter which was a room about half as large as the space occupied by the jury; that for this he received $5.00; that he janitored and took care of Pixton's restaurant managed by Mr. Salmon from 1928 down to the present time; that Mr. Salmon noticed that he frequently coughed very violently and sometimes rested; that he performed janitor work for Mr. Eldredge which consisted of cleaning the stairs and hallway in a building in Twin Falls; and for this he received, or receives now about $8.00 a month; that in taking care of the Pixton place he was assisted by his wife at times. There may be something else that goes in if I could but think of it.

"Mr. Dawson: I believe the record shows that W. J. Lloyd paid him $8.00 a week, not $8.00 a month. I further insist that there be stricken from the question, as there is no evidence to show, that he fell from exhaustion while working or that he frequently spat blood; there is no evidence of his spitting blood frequently; there is evidence he spat blood but not frequently. There is no evidence at all that the work as a janitor exhausted him. I don't recall Mr. Salmon's testimony that he coughed violently and frequently rested while working for him.

"Mr. Wolfe: The falling down may be stricken out, while mowing the lawn that may be stricken out from the record. The rest I think is properly there.

"The Court: Do you think there is any evidence that he became exhausted from janitor work? I do not recall any witness using that term.

"Mr. Wolfe: I think that is a fair interpretation, perhaps not the exact language of Mrs. Dell and Mr. Salmon.

"The Court: No one testified that the coughing caused the recurrence of the hernia.

"Mr. Wolfe: I understood such was the testimony.

"The Court: The coughing?

"Mr. Wolfe: That is my memory.

"The Court: The ruling in regard to expert testimony based upon a hypothetical question which must relate a substantial statement of the evidence is that a fair substantial statement be made of the evidence and given to the witness. I also instruct the jury in these cases that they can consider the testimony of the expert witnesses but if they think it is not based on a fair statement of the testimony they can give it no value whatever. The jury is cautioned in that regard in the instructions of the court. I will overrule the objection.

"Mr. Dawson: I would like an exception.

"The Court: Granted.

"Q. Doctor, do you have in mind the question that you are now asked to answer, the hypothetical question? A. I do, the substance of it, I think.

"Q. Do you understand that that includes your own observations of this man? A. Yes.

"Q. Now tell the jury if in your opinion this man was totally disabled on the 26th of June—the 26th day of May, 1919?

"Mr. Dawson: Same objection as given to the previous question.

"The Court: Overruled.

"Mr. Dawson: Exception.

"A. In my opinion I think he was.

"Q. State whether or not in your opinion that total disability was permanent? A. In my opinion—

"Mr. Dawson: Same objection.

"The Court: Same ruling.

"Mr. Dawson: Exception.

"The Court: What date, Mr. Wolfe?

"Mr. Wolfe: May 26, 1919.

"Q. Will you answer? A. In my opinion I think his disability was permanent."

The objection to which we address our attention is as follows: "Secondly, the question propounded to the medical witness asks for his opinion as to the ultimate fact in the case which invades the province of the jury."

It has been held in a number of recent cases that the answer to such a hypothetical question invades the province of the jury. U. S. v. Bass (C. C. A. 7) 64 F.(2d) 467, 470; U. S. v. Sauls (C. C. A. 4) 65 F.(2d) 886; Prevette v. U. S. (C. C. A. 4) 68 F.(2d) 112; Harris v. U. S. (C. C. A. 4) 70 F.(2d) 889, 890; Miller v. U. S. (C. C. A. 5) 71 F.(2d) 361; U. S. v. Steadman (C. C. A. 10) 73 F.(2d) 706, decided October 30, 1934.

In U. S. v. Bass, supra, decided April 7, 1933, the Circuit Court of Appeals of the Seventh Circuit considered the question of the admissibility of opinion evidence in answer to such a hypothetical question, and said: "Error is also assigned on the ruling of the trial judge sustaining an objection to questions asked of two physicians for their opinion as to whether or not Bass was totally and permanently disabled. That was the very question to be determined by the jury and the trial judge permitted full inquiry as to the basic facts from which the conclusion was to be drawn."

In U. S. v. Sauls, 65 F.(2d) 886, 887, the Circuit Court of Appeals for the Fourth Circuit passed upon the question as to the admissibility of such evidence in response to a hypothetical question. We quote from that opinion as follows:

"A new trial is asked on the further ground that the court, over the objection of the government, allowed certain witnesses to give their opinions as to the inability of plaintiff to engage continuously in a gainful occupation. The exception to the following question asked the witness Iseley and his answer thereto present the point. The witness was asked the question: 'I ask you Mr. Iseley, from your observation of him, whether or not, in your opinion, since you first knew him, in 1923, up to now, he has been able to engage continuously in any gainful occupation?' And he answered: 'No, sir, his physical condition was such he could not.'

"We think that this question and answer were clearly objectionable, in that they invaded the province of the jury, and that this objection is valid irrespective of whether the witness be a lay witness or an expert. The ultimate question on the totality of disability was whether plaintiff was able to follow continuously a substantially gainful occupation. What is meant by continuously in the regulations construing a war risk policy is a question of law. See Carter v. U. S. (C. C. A. 4) 49 F.(2d) 221. The same is true as to what is to be deemed a gainful occupation under these regulations. The question permitted the witness to settle these questions of law for himself, and, applying this law to the facts within his knowledge, to try the very question which the jury had been impaneled to try. This should not be permitted. Spokane & I. E. R. Co. v. U. S., 241 U. S. 344, 36 S. Ct. 668, 60 L. Ed. 1037; National Cash Register Co. v. Leland (C. C. A. 1) 94 F. 502; Safety Car Heating & Lighting Co. v. Gould Coupler Co. (C. C. A. 2) 239 F. 861, 865; Castner Electrolytic

702

Alkali Co. v. Davies (C. C. A. 2) 154 F. 938, 942; Standard Fire Extinguisher Co. v. Heltman (C. C. A. 6) 194 F. 400, 401; Smith v. Board of Comm'rs of Lexington, 176 N. C. 466, 97 S. E. 378; Kerner v. So. Ry. Co., 170 N. C. 94, 97, 86 S. E. 998; Deppe v. Atlantic Coast Line R. Co., 154 N. C. 523, 524, 70 S. E. 622; Phifer v. Carolina Cent. R. Co., 122 N. C. 940, 29 S. E. 578; Marks v. Harriet Cotton Mills, 135 N. C. 287, 47 S. E. 432; 22 C. J. 502, and cases there cited."

In Prevette et al. v. United States, 68 F.(2d) 112, 113, supra, decided January 4, 1934, by the Circuit Court of Appeals for the Fourth Circuit, the court said: "Over the objection of the plaintiff, a physician, testifying for the United States, was allowed to express the opinion, in answer to a hypothetical question based on the work record of the insured, that on October 28, 1918, the insured was not totally and permanently disabled. It was error to receive this testimony for the reasons pointed out in our decision in United States v. Sauls, 65 F.(2d) 886."

These decisions were followed by that court in the later case of Harris v. United States, 70 F.(2d) 889, 890, decided May 1, 1934, in which the court said: "As to the other assignment of error relating to the medical testimony, that also is without merit, because had the physician been permitted to answer the question, this would have been tantamount to permitting him to settle matters of law for himself and by applying the same to the facts within his knowledge, to try the very questions that the jury had been impaneled to try. In Prevette v. United States, 68 F.(2d) 112, and United States v. Sauls, 65 F.(2d) 886, this court held that similar testimony should be excluded."

The Circuit Court of Appeals for the Fifth Circuit, in Miller v. U. S., 71 F.(2d) 361, 362, decided June 8, 1934, held that the testimony of the physician that in his opinion the veteran was totally and permanently disabled was insufficient evidence of the fact to take the case to the jury. In view of the fact that this decision calls attention to and is in part based upon the recent decision of the Supreme Court in Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 275, 78 L. Ed. 492, as to what constitutes permanent and total disability within the meaning of the war risk insurance policy, we quote from the opinion in Miller v. U. S., supra, as follows:

"The history of the matter is this: The War Risk Insurance Act of 1917 (40 Stat. 398) provided in separate articles for compensation for death or disability contracted in the line of duty, and for insurance against death or total permanent disability. Total permanent disability was not defined by the act. On March 9, 1918, it was ruled both as to compensation and insurance that any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed to be total disability, and that the disability shall be deemed permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering it. T. D. 20 W. R. The courts generally accepted this as a correct definition of the total permanent disability insured against, but it was said in Lumbra v. United States, 290 U. S. 559, 54 S. Ct. 272, 78 L. Ed. 492, not to be an exact definition of total permanent disability or the sole guide by which that expression is to be construed in term insurances. * * *

"Regulations aside, the evidence did not warrant a finding of total permanent disability. The phrase is to be construed reasonably, and, having regard to the circumstances of each case, without fixed rules or formulæ uniformly governing the construction. Lumbra v. United States, 290 U. S. 551, 558, 54 S. Ct. 272, 78 L. Ed. 492. Such disability as Miller had because of his defective eye and the loss of his right hand was permanent, but it was not total. He was without pain or sickness. He had one good eye and the other was of some use. * * *

"Neither do we think the opinion of his physician that he was totally disabled of any weight. That was the ultimate question to be settled by the trial, and a witness ought not to have been allowed to attempt to decide it. United States v. Sauls (C. C. A.) 65 F.(2d) 886; United States v. Bass (C. C. A.) 64 F.(2d) 467."

These cases are all authority for the proposition that the question objected to in the case at bar called for incompetent evidence because the opinion called for invaded the province of the jury. The decision of the Circuit Court of Appeals for the Seventh Circuit in United States v. Matory, 71 F.(2d) 798, 799, by Circuit Judges Fitzhenry, Evans, and Sparks, was evidently not intended to overrule the decision of the same court in U. S. v. Bass, 64 F.(2d) 467, supra, by Circuit Judges Alschuler and Evans and District Judge Wilkerson, for it is based upon Prevette v. U. S., supra, and U. S. v. Sauls,

supra, which are in accord with U. S. v. Bass, supra. The court, in U. S. v. Malory, supra, said: "It was error to permit the medical witnesses of appellee to testify that he was totally and permanently disabled without qualifying them with a knowledge of the meaning of total and permanent disability in a suit upon a war risk insurance policy. Prevette v. United States (C. C. A.) 68 F.(2d) 112, 113; United States v. Sauls (C. C. A.) 65 F.(2d) 886, 887."

The inference from the quoted statement is that, if the question had embraced the proper legal test of permanent and total disability, it would have been a proper question, but this assumption is dictum.

The appellee contends that the decisions for the Fourth and Seventh Circuit Courts of Appeals are erroneous and should not be followed. Before further consideration of that question, we call attention to the fact that the specific question asked in the case at bar has some objectionable features not involved in the above decisions. A hypothetical question which calls upon a witness to determine the credibility of other witnesses or to pass upon conflicts in the testimony invades the province of the jury, whose duty it is to determine where the truth lay in cases of conflicts in the evidence. Dexter v. Hall, 15 Wall. (82 U. S.) 9, 21 L. Ed. 73; Jones on Evidence, vol. 2, § 372; Estate of Gould, 188 Cal. 353, 205 P. 457; 22 C. J. § 807, p. 720. As stated in Jones on Evidence, vol. 2, § 372:

" * * * All questions calling for their [expert] opinion should be so framed as not to call upon them to determine controverted questions of fact or to pass upon a preponderance of testimony. * * * When the question is so framed as to call upon the expert to determine as to which side of the evidence preponderates, or to reconcile conflicting statements, he is in effect asked to decide the merits of the case, which is a duty wholly beyond his province. * * *

Page 913: "Although cases almost without limit might be cited which recognize the principle that an expert cannot be called upon to give an opinion determining the merits of the case or to weigh conflicting evidence, or to judge credibility of the testimony, such witnesses are constantly allowed to state their opinions based upon facts within their own knowledge or facts assumed in hypothetical questions. If the hypothetical question properly presents the fact which the evidence tends to prove, and does not call upon the witness to reconcile conflicting evidence or pass upon the merits of the case, a wide range may be given by the court and a liberal allowance as to its form."

In the foregoing question, the witness was asked to assume that at the time of insured's discharge the medical officer who examined him certified that the insured was physically and mentally fit excepting only the results of exposure to mustard gas on October 26, 1918, and that that disability was not likely "to result in death or disability," and that "in view of his occupation he was not disabled at all." The question called upon the witness to determine whether or not in his opinion at the time of the defendant's discharge on May 26, 1919, he was totally and permanently disabled, and this in the teeth of the medical certificate that at that time he was not disabled at all. In effect, the witness was called upon to determine whether or not at the time of his discharge the certificate of the medical examiner signed at that time did or did not state the true condition. If it stated the true condition, of course he was not then totally and permanently disabled. The witness could not assume the certificate to be true without answering that the veteran was not disabled at the time of his discharge. It is evident, therefore, that in his answer he assumed that the certificate did not state the truth. The certificate referred to had been introduced by the plaintiff, and was entitled to such weight as the jury might assign to it. It is manifest then that the hypothetical question called upon the witness to invade the province of the jury in determining where the truth lay with reference to the condition of the veteran at the time the medical examiner certified that he was under no disability. For this reason alone the objection should have been sustained.

The same objection would apply to the statement of the veteran that he was not disabled when discharged. In this connection it appears from the government records introduced by the plaintiff that on May 23, 1919, he was asked the question, "Have you any reason to believe that at the present time you are suffering from any effects of any wound, injury or disease, or that you have any disability or impairment of health whether or not incurred in the military service," and that the insured answered "No." The fact that this question was asked the insured at the time of his discharge is stated in the hypothetical question above quoted, but the answer "No" to the question given in the medical record is not embodied in the hypothetical question, although no doubt this fact

was overlooked by the court, by counsel, and by the jury. We refrain from further discussion of that phase of the matter because of the fact that it appears from the transcript that the hypothetical question did not include the answer of the veteran.

■ We now pass to a consideration of the general question as to whether or not the submission of the question of permanent and total disability to the witness invaded the province of the jury. The decisions of the Circuit Courts of Appeals for the Fifth and Seventh Circuits held that to permit a medical witness to give an opinion on whether or not the veteran who claims to be totally and permanently disabled is able continuously to engage in an occupation is to permit the witness to decide the very question to be submitted to the jury. That this ruling is correct is made clear by the nature of the question and answer admitted in the case at bar. The question incorporated a definition of total and permanent disability, so that in effect the attorney asking the question instructed the witness as to what constituted total and permanent disability under the law, and submitted to the witness the question as to whether or not under that law the witness was of the opinion upon the facts assumed that the disability of the veteran was total and permanent. Thus the witness was asked to decide the exact question for the jury; that is, the question of total and permanent disability under the law and the facts. The witness received his instructions as to the law from the attorney instead of from the court, and delivered an "opinion" upon the law and the facts instead of a verdict, as in the case of the jury. In addition to determining what constitutes continuous employment, the witness was called upon to determine whether in his opinion the rewards for the labor of the insured have been, or may be expected to be, substantially gainful. This again was a question for the jury and not for an expert medical witness.

There is another phase of the hypothetical question which is objectionable as an invasion of the province of the jury. The witness was called upon to state whether or not the veteran was capable of continuously following any gainful occupation whatever. This leaves to the witness the duty of surveying the whole field of human endeavor to determine whether or not the veteran was capable of engaging in any substantially gainful occupation. The hypothetical question does not ask the witness to confine his answer to any specified occupation, nor does it call the attention of the witness to the requirements of any particular occupation, and hence the hypothetical question is open to the common objection that it does not disclose the facts upon which the answer of the expert is to be based. Raub v. Carpenter, 187 U. S. 159, 161, 23 S. Ct. 72, 47 L. Ed. 119; Wigmore on Evidence, § 681. It leaves the witness, in regard to occupation, to do exactly what each juror is called upon to do; namely, to use his common knowledge as to the requirements of the various occupations and to determine upon such knowledge whether or not the veteran is capable of pursuing any gainful occupation. The jury should have been informed by the witness as to the extent of the physical disability of the veteran and then should have applied to that information its own common knowledge of the affairs of men in reaching a verdict.

"* * * From the very nature of expert testimony it follows that it is admissible only when it relates to a subject matter with which the average experience and common sense of the jury are insufficient to deal." 11 R. C. L. § 19, p. 591, supra.

See, also, Inland & Sea-Board Coasting Co. v. Tolson, 139 U. S. 551, 560, 11 S. Ct. 653, 35 L. Ed. 270. As stated by the Supreme Court of California in Kauffman v. Maier, 94 Cal. 269, 29 P. 481, 484, in connection with the admissibility of the testimony of a machinist as to whether or not a rough revolving shaft was dangerous to workmen in the vicinity: "Such questions are to be determined by the jury themselves, either from their own experience in matters of common observation, or from all the evidence in the case, and cannot be asked of witnesses, even if such witnesses are experts in some particular art or science. Sappenfield v. Main Street, etc., R. R. Co., 91 Cal. 60, 27 P. 590. If the court permits the jury to be influenced by the judgment of such witnesses, it deprives the litigants of their right to have the jury render its verdict upon the facts in the case, and to this extent substitutes the judgment of the expert for what should be the judgment of the jury."

■ But there is an even more serious objection to the question in this, that the definition of total and permanent disability submitted to the witness is not the legal test of total and permanent disability. In Lumbra v. United States, supra, it is held that this definition is not the sole test of total and permanent disability. Up to the time of the decision of that case by the Supreme Court, it had been assumed in the trial of war risk

insurance cases that the administrative definition was the legal definition of total permanent disability. That definition has been incorporated in hypothetical questions and in instructions to the jury in many cases. As pointed out by the Supreme Court, it is not a very satisfactory definition, because, in the case of any illness which is likely to recur from time to time, it could be said that the veteran was not able "continuously" to labor. In view of the importance of the matter, in this and other pending cases, we quote from the decision of the Supreme Court in Lumbra v. United States, supra, as follows:

"The war risk contract unqualifiedly insures against 'total permanent disability.' The occasion, source, or cause of petitioner's illness is therefore immaterial. His injuries, exposure, and illness before the lapse of the policy and his condition in subsequent years have significance, if any, only to the extent that they tend to show whether he was in fact totally and permanently disabled during the life of the policy. March 9, 1918, in pursuance of the authorization contained in the War Risk Insurance Act, the director of the Bureau ruled (T. D. 20 W. R.): 'Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed ᛭  ᛭  ᛭ to be total disability. Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it.'

"The phrase 'total permanent disability' is to be construed reasonably and having regard to the circumstances of each case. As the insurance authorized does not extend to total temporary or partial permanent disability, the tests appropriate for the determination of either need not be ascertained. The various meanings inhering in the phrase make impossible the ascertainment of any fixed rules or formulæ uniformly to govern its construction. That which sometimes results in total disability may cause slight inconvenience under other conditions. Some are able to sustain themselves, without serious loss of productive power, against injury or disease sufficient totally to disable others. It cannot be said that injury or disease sufficient merely to prevent one from again doing some work of the kind he had been accustomed to perform constitutes the disability meant by the act, for such impairment may not lessen or affect his ability to follow other useful, and perchance more lucrative, occupations. Frequently serious physical impairment stimulates to successful effort for the acquisition of productive ability that theretofore remained undeveloped.

"The above-quoted administrative decision is not, and manifestly was not intended to be, an exact definition of total permanent disability or the sole guide by which that expression is to be construed. If read literally, every impairment from time to time compelling interruption of gainful occupation for any period, however brief, would be total disability. And, if such impairment were shown reasonably certain not to become less, it would constitute total permanent disability. Persons in sound health occasionally suffer illness requiring them to remain in bed for a time. It is not inaccurate to describe such illness as 'total disability' while it lasts. But clearly it is not right to say that, if they remain sound but reasonably certain throughout life occasionally to have like periods of temporary illness, they are suffering from 'total permanent disability.' Such a construction would be unreasonable and contrary to the intention of Congress. 'Total disability' does not mean helplessness or complete disability, but it includes more than that which is partial. 'Permanent disability' means that which is continuing as opposed to what is temporary. Separate and distinct periods of temporary disability do not constitute that which is permanent. The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. He may have worked when really unable and at the risk of endangering his health or life. But manifestly work performed may be such as conclusively to negative total permanent disability at the earlier time.

"It requires no discussion to show that the evidence in respect of petitioner's condition during the life of the policy has no substantial tendency to prove total permanent disability at the time of the lapse. The evidence as to his subsequent condition may be considered only for the purpose of determining his condition while the contract was in force. His conduct following the alleged accrual of his claim reflects his own opinion as to whether he was totally and permanently disabled at the time of the lapse. His own statements to medical men, their diagnoses, his repeated applications to the government for compensation, and his failure earlier to assert any claim, show that for a decade he did not believe that he was totally and permanently disabled when he let his policy lapse May 31, 1919. And in the ab-

sence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed.

"It may be assumed that occasional work for short periods by one generally disabled by impairment of mind or body does not as a matter of law negative total permanent disability. But that is not this case. Petitioner, while claiming to be weak and ill and, contrary to the opinion and diagnoses of examining physicians, that he was really unable to work, did in fact do much work. For long periods amounting in the aggregate to more than five years out of the ten following the lapse of the policy he worked for substantial pay. No witness, lay or expert, testified to matters of fact or expressed opinion tending to support petitioner's claim that he had suffered 'total permanent disability' before his policy lapsed. Unless by construction these words are given a meaning far different from that they are ordinarily used and understood to convey, the evidence must be held not sufficient to support a verdict for petitioner. The trial court should have directed a verdict for the United States. Gunning v. Cooley, 281 U. S. 90, 93, 50 S. Ct. 231, 74 L. Ed. 720; Stevens v. The White City, 285 U. S. 195, 204, 52 S. Ct. 347, 76 L. Ed. 699."

It is clear that, if the hypothetical question was otherwise unobjectionable, it was error to permit the witness to state a conclusion or opinion as to the veteran's total and permanent disability upon an erroneous definition of what constitutes total and permanent disability. The decision in the Lumbra Case, supra, makes it clear, if it was doubtful before, that the question of whether the veteran is able to follow a substantially gainful occupation with reasonable continuity is a question for the decision of the jury and not for the decision of a medical witness.

We hold, then, that the objection to the hypothetical question should have been sustained for the following reasons:

(1) It called upon the witness to solve conflicting inferences upon the assumed facts.

(2) It permitted the witness to determine what in his judgment constituted continuous employment.

(3) It permitted the witness to determine what amount of employment or reward for employment was substantially gainful.

(4) It did not limit the question to a single occupation or state the requirements of any occupation, and hence did not state the facts upon which the witness necessarily based his opinion.

(5) The submission to the witness of any definition of total and permanent disability in a question which required the witness to apply that definition to the assumed facts was an invasion of the province of the jury, and consequently not a subject for expert testimony.

(6) It submitted to the witness an erroneous definition of total and permanent disability as a basis for the answer to the question.

Judgment reversed.