## FAIRBANKS v. UNITED STATES.
### No. 983.

District Court, D. Montana.
Jan. 2, 1936.

Molumby, Busha & Greenan, of Great Falls, Mont., for plaintiff.

John B. Tansil, U. S. Dist. Atty., R. Lewis Brown, Asst. U. S. Dist. Atty., and Francis J. McGan, Atty., Department of Justice, all of Butte, Mont.

PRAY, District Judge.

This is an action to recover on a war risk insurance contract. The case was tried by the court without a jury, and decision was delayed for an unusual length of time, due partly to the request of defendant to submit further testimony at a later date, leave having been granted therefor. The supplementary transcript was not filed in the case until later, and was followed some time thereafter by briefs of counsel. According to the Lumbra v. U. S. Case (290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492), the fact, as here, that plaintiff waited ten or twelve years before commencing his action is to be taken as a strong suggestion that he was not totally and permanently disabled as alleged. Plaintiff must sustain the burden of proof by a preponderance of the evidence. No one hearing the testimony could doubt that plaintiff was severely wounded and suffered greatly from his wounds, but were they of such a nature as to render it impossible for him to follow a substantially gainful occupation continuously without injury to his health, and were they such as would be likely to continue during the balance of his life? If plaintiff's statement be accepted unreservedly, it would be necessary so to conclude, but there are certain documents and records and testimony of others that must be considered. Defendant's counsel call attention to the healthy appearance of the plaintiff on the witness stand as offering little support to his claim of total disability. A physician described him as being a well nourished and a healthy appearing man. The lay witnesses, neighbors and friends, support plaintiff's contention that he was unable to work very much and that about everything accomplished by him was done by others. They speak of him having sick spells, but the only ones that seem to be definitely accounted for according to defendant was the sunstroke and a fainting spell on another occasion. His wife testified that she did not see the spells described by others. Defendant infers from her statements that, if plaintiff had been accustomed to having so many sick spells, that his wife would have known more about them. There is some documentary evidence, unfavorable to plaintiff; for instance, that of the physicians in the service who attended him. At Fort Riley December, 1918, the record shows the wounds were healed; that he "gets about well, movements and strength practically normal."

At the time of his discharge he answered "no" to the inquiry as to whether he was suffering from the effects of any wound, injury, or disease, or whether he had any disability or impairment of health. December 21, 1918, Capt. Bert I. Wyatt, M. C., United States Army, concluded the certificate of examining surgeon with the remarks: "Physical condition excellent; all scars due to flesh wounds." This, of course, is a mistake, as the evidence shows that he was deeply and badly wounded.

Plaintiff took vocational training, first, at the Commercial College in Great Falls for about three months, studying to become a bookkeeper. He thought that he was not getting on very well, and that being indoors did not agree with him, and thereafter his choice was animal husbandry, which course he pursued at the agricultural college at Bozeman; there he appears to have undertaken a course of study and training extending over parts of the years 1921, 1922, 1923, and 1924, receiving pay at the rate of $150 a month. In connection with this line of work, his counsel inquired:

"That was a vocation you thought where you could use your head and still get along?" to which he replied: "Yes, I could get somebody to help me then." Mr. Johnson, rehabilitation assistant, gives a flattering account of plaintiff's progress in training, in his report of June 27, 1923; he said that he found him plowing potatoes; said that he was overcoming the handicap of his disability and that development of manipulative ability was satisfactory; that he was taking care of 700 acres of land, had 110 acres in winter wheat, 40 in corn, and was doing better on his land than his neighbors, further adding: "He certainly shows hard work and intelligent work on his ranch."

In 1923 he wrote the Veterans' Bureau seeking approval of the purchase of a farm of 300 acres and the leasing of 400 acres adjoining. He stated to the Bureau at that time: "I intend to make this my permanent home as long as I can get a crop and make ends meet. I believe I can make a profit on my ranch here. I have been able to do the work required on this ranch with the aid of occasional hired help." John McLaughlin, employed by the Veterans' Bureau, described a considerable acreage of crops; said plaintiff was plowing 30 acres on his 120-acre tract; he said that Mr. Fairbanks was a hard worker and recommended that he be rehabilitated July 21, 1924. On page 31 of transcript appears favorable findings of the Board granting plaintiff's request that he be rehabilitated; here he stated to the Board that he was satisfied with his training and competent to carry on for himself; that if his crops for the year were good he could pay down $2,000 on some leased land if he decided to buy it. With his request for rehabilitation granted he thereby relinquished his pay of $150 per month. Mr. D. D. Evans, attorney for defendant, said he was acquainted with plaintiff's work, and spoke of him as the most outstanding example of a successful agricultural trainee the Bureau had.

If consideration of the case should end here, accepting the principal features of the defendant's proof as above outlined, it might be difficult to understand how plaintiff could expect to maintain his claim of total and permanent disability. But there are other facts to be considered. The evidence shows that plaintiff was wounded in battle on the 19th of July, 1918, receiving two wounds on the abdomen, two on the hip, and two on the knee. From the X-ray pictures it appeared that two large bullets had passed through the abdomen, lodged against the pelvic bone, and in front of it, and, from that and other sources, that in going through the abdomen they tore the intestines, producing painful adhesions. The defendant's theory seemed to be that the bullets reached their place of lodgment without injury to the intestines, but the evidence clearly excludes any such theory. The wounds in the knee were bad and those in the hip left a hole as large as one's fist, to use the language of counsel for the plaintiff, who removed his clothing, exhibiting all of his wounds, which were described by Dr. Irwin. It will not be necessary to narrate plaintiff's harrowing experiences after being wounded. He was hit about 10 in the morning and lay on the field until long after dark. After hospital treatment and operations in France covering over two months, he was returned to this country on a stretcher and hospital ship and thereafter taken to two or three different hospitals, finally reaching Montana some time in March, 1919, where he had a homestead which he had taken before going to war. He gave up this place after he found that he was physically unable to make the necessary improvements. He then leased land and was obliged to have the help of two men to put in crop of 40 acres. During this time a Red Cross representative found him sick in bed and directed him to see Dr. Murphy at Fort Benton, which he did, and was advised to go to the Veterans' Bureau hospital. At that time he was suffering with severe pains in the abdomen, extending to the middle of his back. Plaintiff said if he had been in his former state of health he could have put in a crop of 200 acres without any help at all. He was obliged to give up this place; it was too much for him; he was even too weak to pump the water needed for the usual domestic purposes. He saw Dr. Southmayd in 1920, but he could not help him very much; the same doctor operated on him in 1921, trying to extract the bullets which he considered the cause of plaintiff's distress. The doctor was unable to remove the bullets but cut the adhesions loose in the first wound, which seemed to be all that could be done; at the same time an appendix operation was performed. After trying again to work the farm, he was taken ill and returned to Dr. Southmayd for further treatment. About May, 1921, he commenced a course of training at a business college, but after three months' trial said he could not stand the training any longer; he was then

transferred to the college at Bozeman for training in animal husbandry. He continued this training during parts of the years, hereinbefore mentioned, during which period he said that he was ill and suffered pain and soreness a great deal of the time; that after he finished training he bought 120 acres of land under contract for which he agreed to pay $1,400, and made a down payment of $500, but that after eight years, down to the date of trial, he still owed $1,264 on the contract. Much of the testimony, outside of that given by medical experts, deals with acreage in crops during the different years.

This record would appear to be fairly credible and would prevent his recovery were it not for the assistance afforded by the money furnished and the men employed by him during the entire period in question; these powerful aides should not be ignored in estimating the amount of credit to be given him for the labor performed and the appearance of his farm. His mental faculties were evidently intact and producing results, but what would that have availed him without the money and the men to carry his plans into effect? It appears that when his training pay ceased he was obliged to take a smaller farm of 120 acres and for which he still owes the greater part of the contract price. Many pages of medical testimony will be found in the transcript. The court has read it and carefully considered it, but does not deem it necessary to take the time to repeat it here. There will be found a conflict, of course, bearing more particularly on his condition since the wounds were received and the extent of the handicap created thereby.

· Not counting the number of physicians and surgeons who treated the soldier for several months after he was wounded, whose names might not readily be obtained, it will be found that the list from 1920 to time of trial is quite formidable. Here are some of the names: Drs. Murphy, Anderson, Whitehead, Southmayd, Fortin, Irwin, Keenan, Nather, Axline, Waters, Lohman, and Walker. Several of them have examined and treated him on different occasions and on widely separated dates. The inevitable deduction from this medical testimony is, that plaintiff has been suffering for many years from extensive adhesions as a result of his abdominal injuries, and that he is subject to pain and stomach attacks upon slight exertion, and that this condition cannot be cured either by opera-

tion or treatment and will probably continue indefinitely. See testimony of Drs. Irwin, Nather, Axline, and Keenan.

This soldier volunteered on a mission that required great courage and was almost certain to end in death or serious bodily injury. He escaped with his life, but was literally shot to pieces, receiving six serious wounds. Months of hospitalization, medical and surgical care, followed these injuries. That he was totally disabled for a long period of time and while his insurance was in force is an established fact to begin with. Next his own statement shows that down to the date of trial he has not been able to follow continuously a substantially gainful occupation. His occupation before the war was that of farm laborer; so far as the record shows, that is the only work he was familiar with, or had ever undertaken. The government, as in thousands of other cases, gave this soldier vocational training—at first to become a clerk or bookkeeper, but it seemed to be a failure, and he thereafter received instruction in animal husbandry, and stuck to that with the same spirit and determination one would expect of a man who had such a record of distinguished service in the Army. But, notwithstanding his training and the favorable outcome, his own testimony, and that of his neighbors, and physicians who have examined and treated him during all these years, make it plain that he has never been able to carry on continuously according to the accepted definition. Counsel for the government refer to his healthy appearance on the witness stand; it is true that his appearance and speech betokened the same manly courage that marked his career as a soldier; he apparently tried to walk erect and without limping. As a witness, there was no dissembling on his part or any attempt to simulate weakness, either physical or mental; but the strained expression of his face and the restless movements of his body while testifying suggested a history of physical disability, as the evidence later disclosed, that had hampered his efforts down to that hour. The court believes that, if it had not been for the considerable sum paid him monthly by the government during all these years, and especially during the period of training, his farming operations would have resulted in total failure. It cannot be denied that the government has already dealt generously with this soldier, but why not? Was he not placed in the trenches to risk his life at the behest of his government? It was

an enterprise that required great fortitude and sacrifice and his government has responded without stint in the matter of compensation.

■ But as separate and apart from compensation and training pay the government entered into a contract of insurance with the soldier, thereby undertaking to insure him against death and total and permanent disability; the latter meaning such a physical condition as would render it impossible for him to follow any substantially gainful occupation continuously without seriously impairing his health, and that such condition would be likely to continue, during the balance of his life. Many decisions of the courts can be found illustrating when this condition may be said to exist; but, after all is said, each case must stand or fall on the facts supporting it. Opinion evidence such as the higher court has ruled out has been disregarded in this case.

Since plaintiff was wounded, he has passed through the hands of many physicians and surgeons who have dosed him with medicine or else cut him open probing for bullets or pieces of shell or else tried to cure his adhesions, the result of the two bullet wounds to his intestines. It would take some time to look through the testimony and figure out how many hospitals he has been in since that unlucky day in France. Some of the government witnesses lauded his efforts, said he had the best looking place in the neighborhood, and that it showed evidences of industry and hard work. That all may be true and yet not disprove his claim of total and permanent disability under the accepted definition of that condition, as interpreted by the courts, in the light of his own testimony, that of his neighbors and the doctors who described his wounds and ailments resulting therefrom. A person, though bedridden, with a brain fairly active and the knowledge of farming possessed by this plaintiff, might have been able to do the same thing with the same amount of money per month with which to hire help and the farming equipment that was furnished him, over a period of several years. The evidence, of course, is conflicting, although the testimony of some of the government doctors in some particulars was favorable to plaintiff's contentions.

■ Were it not for the serious circumstances surrounding this case from its inception, the court might feel obliged to hold that the preponderance of the evidence does not favor plaintiff, but it must be remembered that his physical breakdown resulted in total disability which continued for many months, to begin with, and occurred at the time when his insurance was in full force—that is an established fact; now then, add to that the evidence which clearly shows that his physical condition was such that he has never been able to carry on, during all the intervening years, without a goodly supply of money every month and plenty of help besides, even to the extent of doing the ordinary chores about the place, and from that it would seem that the greater weight of the evidence should be held to establish the contention of plaintiff that he was totally and permanently disabled at a time when his insurance was in force.

The court is not unmindful of the long delay in bringing suit and what other courts have said about it, but, after all is said, and with due respect for the higher authority, how many of these wounded soldiers, happy in thought that they had escaped with their lives and were really on their way home, ever realized what their rights were in respect to their insurance, if they had any at all, until advised by some one who had given considerable thought and study to the subject. Even the lawyers who have made a specialty of these cases, with the number of laws enacted since the war, the lack of harmony in court decisions, and the regulations based upon them, have had considerable difficulty in keeping in court because of the pitfalls resulting from this condition and so often encountered. How could the soldiers know what to do or whether anything could be done when the lawyers themselves have been so often perplexed with the problems presented in many of these cases.

■ But each case is based upon a contract of the soldier's with his government, and it is interesting to note in this connection what Mr. Justice Holmes once said about it, which was in effect that the relationship of the government to the soldier in this contract, if not paternal, is at least avuncular (White v. U. S., 270 U.S. 175, 46 S.Ct. 274, 70 L.Ed. 530); so that it should not be regarded entirely as a cold-blooded business transaction. However, the claimant must be able to prove his case by a preponderance of the evidence, otherwise the law will not permit a recovery. This is often a difficult problem to solve either by court or jury, especially when called upon to exclude from consideration every shred of sympathy in a case deserving it outside

of court. But plaintiff here did not resort to the arts sometimes employed to elicit sympathy, and it was plain to be seen he did not want it, but preferred to win or lose on the merits alone. This court thinks that he ought to win, and findings and conclusions to that effect may be submitted by plaintiff.

Defendant's motion for judgment is denied and an exception allowed, the same to be noted in the journal entry of judgment. U. S. v. Young, 73 F.(2d) 690 (C.C.A.9); U. S. v. Stephens, 73 F.(2d) 695 (C.C.A.9); U. S. v. Lawson (C.C.A.9) 50 F.(2d) 646; Lumbra v. U. S., 290 U.S. 551, 559, 54 S. Ct. 272, 78 L.Ed. 492.