## UNITED STATES v. THOMPSON.
### No. 8373.

Circuit Court of Appeals, Ninth Circuit.
Sept. 13, 1937.

John B. Tansil, U. S. Atty., R. Lewis Brown, Asst. U. S. Atty., and Francis J. McGan, Atty., Dept. of Justice, all of Butte, Mont., and Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Keith L. Seegmiller, Atty., Dept. of Justice, of Washington, D. C., for the United States.

Molumby, Busha & Greenan, of Great Falls, Mont., for appellee.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

This suit was brought to recover total permanent disability benefits under a contract of war risk term insurance which afforded insurance protection from February 1, 1918, to October 1, 1919. The case came on for jury trial on June 23, 1936, with issue joined on plaintiff's allegation that he became totally permanently disabled during the life of the policy. At the close of all the testimony defendant moved for a directed verdict on the ground that there was no substantial evidence to support a verdict for plaintiff. The motion was denied and an exception reserved. Thereafter the jury returned a verdict in favor of plaintiff, in accordance with which judgment was entered on July 18, 1936, awarding benefits from August 13, 1919.

The appellant states the only question presented as follows: "Whether there was any substantial evidence that plaintiff became totally permanently disabled during the period of protection under his insurance contract."

Theodore Thompson, a native of Norway, came to the United States in 1912, nineteen years of age, possessing a seventh grade education, and unable to speak the English language. He settled near Reed Point, Montana, and secured work on sheep ranches, including one operated by a cousin, Carl Bue, earning, by 1917 or 1918, $50 most months and $80 a month during busy seasons. Because most of the men with whom he worked were Norwegians, he did not learn to speak English readily.

Drafted, he went to Camp Lewis, Wisconsin, and was assigned to Company D, 347th Machine Gun Battalion, 91st Division, in the Army. He injured his right knee during night maneuvers and was confined to barracks for approximately a week, although he did not report this injury to a doctor at the time, but only to the captain. Thereafter, in February or March, 1918, he contracted measles, was sent to the hospital, and, while there, fell victim to mumps, both of which confined him to the hospital for a month or six weeks, and to quarters for two weeks more after his release from the hospital. In June he went overseas, seeing action first at St. Mihiel and then at Meuse-Argonne. Two weeks' rest at a camp behind the lines was followed by action at Flanders Field, Belgium.

Lack of proper food at St. Mihiel front and poisoned drinking water brought on diarrhea, dystentery, cramps, and vomiting. The food kitchens were unable to get food to the front at this time, according to the testimony, and the diet was limited to canned beef; the only water was that which collected in shell holes after rain, which was poisoned or fouled by settling poison gas and other things with which it came in contact. The other soldiers drank the same water and ate the same food as did the witness at the front. Thompson inhaled some poison gas at the Argonne while adjusting his gas mask, which affected his breathing and caused vomiting, which disabilities remained with him, he testified, down to the date of the trial.

He was wounded October 31, 1918, at Flanders Field by being struck in the left knee by a shell. So severe was the wound that his left leg was amputated just above the knee, in a field hospital. He was transferred to a base hospital at Boulogne, France, where he spent two or three months, being operated upon, during that time, at least twice. From there he was assigned to a hospital in England, thence to New York and Fort Des Moines, Iowa, until discharge August 13, 1919. During all this time, he says, he was afflicted with cramps and dysentery, but received no treatment for this trouble. The doctors told him he would "get over" the stomach condition when he had proper food; that it could not be cured by medicine. The doctors also told him at that time that nothing could be done for his right knee. At the time of his discharge, August 13, 1919, he was able to be about on crutches, although his right

knee gave him trouble by reason of bearing the whole weight of his body.

His enlistment record showed, among other things: "Physical condition when discharged: "Poor." And in his "Application of Person Disabled in and Discharged from Service" for compensation, made up on the day of his discharge, the "Nature and extent of disability claimed" is set out as "Amputation of left thigh middle third."

After his return to Reed Point, Montana, he stayed with neighbors and with his cousin, Carl Bue, for whom he had worked before the war. He rested, attempting no work. Thereafter, he entered vocational training, but left of his own volition after three months because he was ill and nervous and was unable to read or write the English language with facility and could not, therefore, keep pace with his class. The course attempted was known as "animal husbandry," and had been selected by Thompson with a view to becoming a crop inspector. A survey of the Division of Rehabilitation Board for Vocational Education, made August 12, 1919, indicated that Thompson understood, spoke, and read English "well" and that he could write it "a little." Under "Suggestions" this same survey stated: "A supplementary course in English—reading, writing and arithmetic might be arranged to advantage, prior to taking up the course in Animal Husbandry." On cross-examination it was brought out that in an inquiry regarding vocational education, the appellee had stated that he could read newspapers and could write a letter in English. He testified that he left the training school because he couldn't learn the language; that he could not learn anything and became disgusted; that he asked for training in reading and writing and the authorities did not refuse, but he would not let them teach him because he could not learn and did not have the ambition to do so. On redirect examination he said that he did not know the meaning of "status," "voluntary," "discontinue," or "preference."

After leaving training the appellee returned to Carl Bue's farm, where he remained for about a month, when he went to a farm owned or operated by a Mr. Myrstol, where he stayed for about a year. At the end of that period (in 1921) he went to his 320-acre homestead to "prove it up," but did not farm the land. A Mr. Hans Omdal stayed with him part of the six months spent there. He then moved to a vacant house on land owned by one Terlund,

where he remained for a year and a half or two years until 1924, Omdal again spending part of the time with him. He did not do any farming on the Terlund property. When Omdal was not with him he was obliged to carry his own water and wood and take care of the house. He had moved from his homestead because it was "way out in the hills and it was rough to get in and out." After this he secured the property upon which he was living at the time of the trial, paying $2,500 for it, which he borrowed from Mr. Bue. Part of the homestead he sold to Mr. Bue for $2,400. He began to acquire stock and equipment for farming, using for this purpose the compensation paid him by the Government. This new farm was of 320 acres, of which about 40 acres was in cultivation and the remainder in pasture. Since 1924 when he bought this ranch he has not increased the area under cultivation and has raised only hay on it. Since acquiring the stock it is necessary for him, so he testified, to hire a man to care for it, paying him out of his compensation, because the ranch is not self-supporting. During the haying season he sometimes hires as many as six men, at other times he keeps only one man. At the time of the trial he had 44 head of cattle, a few chickens, and 10 or 12 sheep. He had increased his land holdings to 749 acres, which included the land purchased from Carl Bue and an additional homestead. He directs the work on the ranch, telling the hired men what he wants done, but is unable to supervise the work.

He testified that he did not make money by his farming operations in 1924, but lost money; that he could not remember any years in which he made money, although he farmed each year since 1924. He said further that he would not have been able at any time any year to have run his ranch without compensation from the Government; that he has had to use his compensation to "get by"; that there has never been a year since he left the army when the returns from the land were sufficient to pay the help and maintain himself.

He stated that he is able to milk a gentle cow; that he had not attempted to put up hay himself; that he was not able to drive a team of horses in the field; that he had not tried to harness a team since leaving the army; that he had driven a derrick team in a small cart; that he can ride horseback if the horse is gentle, but that it is very dangerous because of the awk-

ward method of mounting necessitated by his artificial limb; that he owns a car and can drive it after a fashion.

Significant also is the statement, made on cross-examination, that he cannot live in a town, that he could not live in Gray Cliff or Big Timber, Montana, because of his nervous condition.

It was brought out on cross-examination that, on December 18, 1919, Thompson wrote the Bureau of War Risk Insurance, Washington, D. C., to the effect that he "was wounded in Belgium, Oct. 31, 1918, by a high explosive shell, and amputation of left leg above the knee, and minor injuries about the face," and stated: "I note that a number of men similarly injured are drawing their insurance. I am writing to inquire whether or not I am entitled to do likewise. I am drawing $30.00 per month compensation and am totally and permanently disabled in so far as my former occupation of farming is concerned." July 6, 1921, the appellee made application for reinstatement of his term insurance in the amount of $5,000. On that day he signed two forms, included in the application, in one of which he stated that he was in as good health as at the date of his discharge, and, in the other, that he was in good health. He was examined by a doctor and the insurance reinstated, upon which he was paying premiums, deducted from his compensation, at the time of trial.

He had taken medicine for his stomach trouble, salts, mineral oil, and pills, and visited doctors on various occasions, but never requested treatment of the Government for that ailment.

July 19, 1924, he wrote the Bureau office at Helena, Montana, returning railroad transportation and papers sent him for admittance to the Government Hospital at Helena, because "I cannot possibly leave my ranch at this time since I cannot hire any one to take care of it for me." He added: "I wish to go later on however and I shall advise you as soon as I can make arrangements to leave here."

A letter was sent him October 7, 1926, by the regional medical officer at Helena, as follows: "This office is in receipt of a communication from Dr. Claiborn of Big Timber, informing us that you are in need of hospital treatment. If you will notify us as to the time you will be ready to come to Helena for this treatment, hospital admission card and transportation will be for-warded to you for this purpose." Thompson replied: "Regarding my coming to the hospital for treatment, will say I am trying to make final proof on my homestead, and it will be coming up November 29th, and as I am in no worse condition than I have been for months, I would prefer to wait till after that time, however if you insist I will try to come up now, with the understanding that I will be allowed to return by that time."

Questioned as to these papers, which were presented as exhibits by the defendant-appellant, the appellee on redirect examination admitted his signature, but denied having actually written the body of such exhibits, stating that they must have been written by someone else, although he signed them.

Dr. William George Richards, called as a witness by the plaintiff, examined Thompson in July, 1924, testified that, in addition to the amputation resulting from gunshot wound, plaintiff had impaired vision and hearing and was suffering from a chronic condition of colitis, of which dysentery is a frequent precursor. The prognosis of the stomach condition, made at the time, was "doubtful." The doctor also examined the plaintiff about a year before the trial and noted no particular change in his condition.

Dr. L. W. Allard, who had examined the plaintiff a year before and again the day before he was called as a witness, stated that the stump of the left leg was subject to inflammation and irritation caused by the socket of the artificial leg, and that there was a slipping cartilage in the right knee.

Dr. D. Claiborn of Big Timber, Montana, had prescribed for a stomach complaint, perhaps two or three times a year since Thompson was discharged from the army. He said that he had written letters for the plaintiff on various occasions. On cross-examination he said that except for one occasion when he was called to the ranch to treat Thompson, all the other occasions were for more or less trivial conditions, minor ailments.

That the plaintiff has suffered a tremendous disability in the loss of his left leg is not and cannot be disputed. It must be obvious to all that this amounts, in itself, to a permanent partial disability. We, therefore, in outlining the testimony of lay witnesses, will not dwell on this phase of

plaintiff's misfortune, but, rather, direct our inquiry into other or additional disabilities which plaintiff contends do (and the defendant that they do not) add up into total permanent disability.

When the plaintiff-appellee entered the United States Army, he could not speak the English language well and could not write it at all. His understanding of the language was fragmentary. This may have been due to the fact that he had no schooling in this country and but very little in his home country; but the witnesses, his friends and neighbors, attribute his lack of knowledge of the English language to the fact that the men with whom he worked after coming to this country all spoke Norwegian and that he had no opportunity to learn to read, write, or speak English. He was, by these reasons, almost overwhelmingly handicapped during his attempt at vocational training. He could not under those circumstances be expected to keep pace with his classmates, much less compete with them.

Witnesses are in agreement that Thompson was nervous, excitable, seemed to stutter and tremble, at the time of his return from the Service; that he did no work and attempted none; that friends and neighbors helped him in practically everything; that he hired men to work on his ranch, generally one man, except at harvesting, and directed the work, but did not supervise it; that Thompson had done light chores about his ranch on occasions.

One of the witnesses had served with Thompson overseas and said that he ate the same food and drank the same water and that he suffered from diarrhea. Another, who had worked for Thompson, said that the latter was forced to diet; that he had frequent spells of vomiting; that when he walks his right leg becomes swollen; and that it is not possible for a man to make a living out of Thompson's land.

On the other hand, the defendant attempted to introduce as exhibits, copies of letters purporting to offer medical and hospital treatment to Thompson and also vocational training. The introduction of these letters was objected to by plaintiff's counsel and the objection sustained. Thompson said that he did not remember having received any of the letters offered.

To sum up: Theodore Thompson had lost his left leg; he had a slipping cartilage in his right knee; he had a chronic condition of colitis and was subject to vomiting spells; he was handicapped by his lack of education and by difficulties with the language; and he had no work record—the testimony reveals that without his compensation he would have been unable to exist, his farm was unable to support him.

Now, taking the view of the evidence most favorable to him, as we must [U. S. v. Todd (C.C.A.9) 70 F.(2d) 540, 541], the question is: Was that evidence substantially sufficient to entitle the plaintiff to have his case submitted to the jury, in the face of the motions made by the defendant? We are of the opinion that it was.

It is not the function of this court to weigh the evidence [U. S. v. Alger (C.C.A.9) 68 F.(2d) 592, 593]; that is the duty of the jury; but, because a federal trial court is not permitted to submit a case to a jury upon probabilities or upon a mere scintilla of evidence, we must inquire into the testimony to ascertain whether or not there was any substantial evidence upon which this case could, under the decisions, be submitted to the jury.

Of these war risk insurance cases, perhaps more than of any other class, it may be said that each case must be governed by its own facts. Hardly any case comes squarely within the facts and law as determined by another. So, the cases cited by appellant to the effect that loss of the use of one leg is not enough, in ordinary circumstances, to amount to a total disability, although it is, unquestionably, a partial permanent disability, are all distinguishable upon the facts from the one at bar. It must be kept in mind that the appellee does not contend that the loss of his leg alone made his disability totally permanent, but that this injury, coupled with the other facts and surrounding circumstances here presented, did produce a condition of total disability which was permanent.

The Circuit Court of Appeals for the Fourth Circuit said, in United States v. Trollinger et al., 81 F.(2d) 167, 168: "While the evidence as to bronchitis and heart condition might not have been sufficient of itself to justify a verdict of total and permanent disability, the evidence as to the nervous and mental condition of insured, taken in connection with the other evidence, was sufficient, in view of the fact that the extent and nature of the disability resulting therefrom was clearly established by the testimony of physicians who treated the in-

140

sured and that there was no work record in contradiction of their conclusions."

The appellant contends that the insured did not attempt to adapt himself to other occupations, but it is not to be expected that the insured must attempt an occupation for which he is unfitted by nature in order to prove his total and permanent disability. His physical and mental capabilities must be taken into consideration. Barksdale v. U. S. (C.C.A.10) 46 F.(2d) 762.

See, also, United States v. Fairbanks (C.C.A.9) 89 F.(2d) 949.

As early as December 18, 1919, the appellee wrote the Bureau of War Risk Insurance requesting payment of his insurance, so that he is not to be put to the disadvantage referred to in Lumbra v. U. S., 290 U.S. 551, 560, 54 S.Ct. 272, 276, 78 L. Ed. 492, where the court said: "And in the absence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed." The letter indicates that even at that early date the appellee believed himself to be totally and permanently disabled.

The results have proven that Thompson was incapable of carrying on the occupation of farmer; the evidence presented was sufficient at least to raise the question of whether or not he could carry on any other occupation. The determination of the issue was properly for the jury.

Judgment affirmed.