## UNITED STATES v. ASPINWALL et al.*
### No. 8715.

Circuit Court of Appeals, Ninth Circuit.
May 20, 1938.

*Rehearing denied July 18, 1938.

Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., Thomas E. Walsh, Atty., Department of Justice, of Washington D. C., and Keith L. Seegmiller, Sp. Asst. to Atty. Gen., Carl C. Donaugh, U. S. Atty., and Gerald J. Meindl, Atty., Department of Justice, both of Portland, Or.

Geo. A. Rhoten and R. H. Bassett, both of Salem, Or., for appellees.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

A judgment was entered for appellees in an action brought by them to recover benefits on a war risk insurance policy issued by the United States, insuring the life of Kenneth Aspinwall, deceased. The United States has appealed from the judgment.

Deceased entered military service on April 9, 1917, and on November 16, 1917, applied for and obtained a war risk term insurance policy on his life, in the amount of $10,000. Appellee Ellen Aspinwall, deceased's mother, was named beneficiary therein. He was discharged from service on May 17, 1919. Subsequent to June 1, 1919, he converted $1,000 of the term policy into a twenty-year endowment policy. Payment of premiums and the grace period were sufficient to keep the term policy in the amount of $9,000 in force until June 30, 1919. While on a trip from Salem, Oregon to Birmingham, Alabama, on which he started June 1, 1920, he died at Memphis, Tennessee on July 18, 1920.

In December, 1929, appellee Harold Aspinwall was appointed administrator of deceased's estate in a state court in Oregon. On February 6, 1930, appellees filed a complaint in the court below, alleging that while the term policy was in full force and effect, deceased became, and remained until his death, totally and permanently disabled, and prayed recovery of a judgment on the $9,000 term policy. The disabilities alleged were "disease of the lungs, heart and kidneys and * * * after-effects of exposure to poisonous gasses and * * * severe nervous, mental and physical shock". The United States denied the allegation of total and permanent disability. Trial began on January 14, 1936.

Appellees asked Dr. G. R. Vehrs, one of their witnesses, a hypothetical question. Appellees related much evidence as assumptions, and then asked, "assuming all of these facts, Doctor, which I have related to you, could you state what, if anything, [deceased] suffered from at or about the time of his discharge from the army * * * and before June 30, 1919?" Appellant objected to the question on the ground that the question did not relate all the evidence. The objection was overruled. The witness was then asked, "Could you state whether or not based on the facts which we have related to you, he continued to suffer from the same or different illnesses until the time of his death?" Appellant made the same objection which had been made to the previous question which was overruled. After answering that he could, the witness was asked to state his opinion. Appellant again objected on the same ground of the previous question, and the objection was overruled. Thereupon appellees asked the witness: "Doctor, taking all those questions which involve the hypothetical set of facts which were related to you by counsel, would it make any difference in your answer if any of the following assumed facts were added thereto" and the evidence mentioned by appellant in the objections to the previous questions, was then related. Thereupon appellant objected to the question on the ground "that it is asking the witness to weigh testimony in the record and is, therefore, invading the province of the jury."

At the close of the evidence, appellant made a motion for a directed verdict, which was denied. The trial court denied a request of appellant for the following instruction:

"You are instructed that if you find there was not any clear or satisfactory evidence explaining, excusing or justifying this long delay by the plaintiffs before bringing this action, you must take this long delay as strong evidence that the deceased was not permanently and totally

disabled before his policy of insurance lapsed."

It also gave an instruction, to which appellant excepted, as follows:

"I instruct you definitely that the mere fact that there is a lapse of some sixteen or seventeen years—sixteen years since the lapse of this policy—is a question which is not for your consideration at all."

Appellant's request for the following instruction was denied:

"* * * if you believe that the insured might have recovered from his disability if he had followed proper medical care and treatment, then you must find for the defendant. In order for a disability to be deemed permanent it must be proved by the plaintiffs that the insured's disability was absolutely incurable prior to the time his policy lapsed."

Likewise, appellant's request for the following instruction was denied:

"You are instructed that unless you find that there was medical testimony to the effect that the insured was suffering from an incurable condition on June 30, 1919, you must find for the defendant."

Covering that subject-matter, the court gave an instruction, to which appellant excepted, as follows:

"* * * if you find he was permanently and totally disabled upon June 30, 1919, it makes absolutely no difference whether he went to a doctor or not. He didn't have to. The government didn't put that in his policy. If they wanted him to be bound by such a stipulation, they were bound to put it in the policy. He did not have to take any care of himself whatsoever."

Finally, the trial court instructed the jury that the question for it to determine, was the date on which the deceased became permanently and totally disabled; that the affliction which caused his death was immaterial so long as he was totally and permanently disabled. Appellant excepted to the instruction on the ground that "if the insured died from some disability which he did not have at the time his policy was in force and effect, it * * * would be a material matter for the jury to consider in determining whether or not disabilities that the deceased may have had while the policy was in force and effect were permanent."

The jury returned a verdict for appellees, upon which the judgment was rendered. This appeal followed the denial of a motion for a new trial.

Appellant contends that the objections to the questions of Dr. Vehrs should have been sustained on the ground that they permitted the witness to weigh conflicting evidence. No such objection was made to any of the questions except the last one, wherein the witness was asked if there would have been any difference in his answers if he had considered all the evidence related, which included the evidence which the government insisted should be contained in the question. We do not consider the contention with respect to any of the questions, except the last one, because where "a party excepts to the admission of testimony he is bound to state his objection specifically, and in a proceeding for error he is confined to the objection so taken." Stebbins v. Duncan, 108 U.S. 32, 46, 2 S.Ct. 313, 322, 27 L.Ed. 641.

With respect to the last question, appellant relies on United States v. Stephens, 9 Cir., 73 F.2d 695, 703. In that case a hypothetical question related evidence, and included another expert's opinion that the insured was "physically and mentally fit" at the time of his discharge, and the witness was then asked if the insured "was permanently and totally disabled." It was held that "the hypothetical question called upon the witness to invade the province of the jury" because in "effect, the witness was called upon to determine whether or not at the time of his discharge the certificate of the medical examiner signed at that time did or did not state the true condition." It was also held that the question invaded the province of the jury because it required a statement from the witness which was the ultimate question for the jury to determine. Neither of these objections may be laid to the question in controversy. The witness was not required to determine whether some other witness had or had not told the truth, and he was not asked whether or not the insured was totally and permanently disabled. The objection that appellees limited the facts in the question, or included a great many, is not tenable, we think. The questioner may limit the facts, and the fairness of the question is largely in the trial court's discretion. 1 Wigmore on Evidence, 2d Ed., § 682.

Appellant contends that there was no substantial evidence to submit to the jury on the question of total and permanent dis-

ability, and the jury arrived at its verdict "by resorting to speculation and conjecture", because there "was no evidence introduced to show that he contracted or developed a condition which might be considered totally and permanently disabling during the short space of a month and a half which elapsed between discharge and the expiration of the grace period".

In viewing the evidence, we must take the view most favorable to appellees (United States v. Thompson, 9 Cir., 92 F.2d 135), and draw in their favor "all inferences fairly deducible from such facts." United States v. Klever, 9 Cir., 93 F.2d 15, 16.

Deceased enjoyed good health prior to his enlistment. During military service he was treated from December 7, 1917 to December 28, 1918, for otitis media, suppurative, concerning which Dr. Vehrs testified as follows:

"* * * Acute otitis media is inflammation of the middle ear. The usual symptom of otitis media is ringing of the ear and combined possibly with some headache, pain in the ear, in the region involved. In light cases there may or may not be fever, and, if present, only a degree or two. Acute otitis media is a catarrhal condition which may form pus or may not. Suppurative means pus. When pus is added to the picture, the pain is greater, ringing of the ears is greater, the fever goes up, the patient may or may not have a chill. About ninety-five per cent of the cases of otitis media originate from the nose. It may also come from infection in the body like a localized condition in the middle ear or mastoid, or localized conditions near the brain and covering of the brain, called the meninges. * * *"

Deceased was treated from January 1, 1918, to January 9, 1918 for mastoiditis. Dr. Vehrs testified that there was a mastoid sinus behind each ear; that

"* * * Inside it [the bone of the mastoid sinus] is hollow and honeycomb in type, which honeycomb forms many connecting or not connecting compartments. These compartments are filled with air, normally. The passage leading from the middle ear into the mastoid is a direct communication. * * *

"Mastoiditis is an inflammation which involves the inner part of these compartments. This inflammation is accompanied by a pus formation. This inflammation breaks down the honeycomb and part of the cavity, because the pus kills the lining membrane, or eats into it. It destroys a portion of the bone if it is that severe, * * *

"There is a thin layer of bone, a thirty-second to a sixteenth of an inch thick, usually between the mastoid cells and the covering or meninges of the brain proper. * * * We call it meningitis if there is an inflammation. * * * The meninges would be from a thirty-second to a sixteenth of an inch away from the mastoid cavities. If this thin part tends to be inflamed and decayed and rotting away, then this distance is shortened, depending upon the amount of inflammatory process there. When that inflammation is present and that pus condition is present, it would tend to eat away this protecting wall which exists between the brain and the mastoid cavities, * * *

With chronic otitis media there is always a mastoiditis. Therefore, there is a chronic mastoiditis. If a mastoiditis continued from January 1, 1918 to January 9, 1918, it should develop into a chronic mastoiditis. Other symptoms of mastoiditis or otitis media are severe pains behind the ear, headache which is mainly on the side of the ear involved, stiffness of the muscle of the neck which is attached to the mastoid, rigidity and pain in the lower and back part of the skull and in the upper part of the neck, combined with fever and the results of fever, and a high blood count, a high white cell count of the blood. The pain in the back of the neck and back of the head is caused by a nerve which comes out from between the mastoid and the bones—the upper bone of the neck, which is distributed to the back part of the skull and to the scalp. It is a sensory nerve, or it is the nerve which perceives pain. It likewise could be due to an inflammation of the covering of the brain at the thin part of the mastoid, because all inflammations localized in character of the covering of the brain will produce a pain in the back part of the head and the upper part of the neck, with a rigidity, a stiffness of the neck. A mastoiditis will normally create a pain in the back of the neck and the back of the head. The pus inflammation would be caused by a germ of some sort. Disease processes may remain practically encysted or inclosed and be inactive to the patient except for a certain few symptoms, which he thinks is getting better

and he may be considered well, and then go on for months and be set up again or continue and be ruled out by the resistance of the patient, and if not killed by the patient's blood and his fighting organisms, then it will continue or it may become worse at such time, depending on the amount of toxicity, or poisonous matter produced by the bugs and also by the resistance of the patient."

Deceased was also treated for mumps from February 1, 1918 to March 16, 1918. In addition deceased was treated for herpes zoster, beginning on May 18, 1918, but the record does not disclose the length of time he received such treatment. Dr. Vehrs discussed this disease as follows:

"* * * The simple type, or shingles, is considered severe by the patient but by the doctor is not disastrous. The pus type, or the suppurative type, is a very severe disease and involves the posterior, the back part of the spinal cord itself, the ganglia or enlargements of the sensory nerves, the pain nerves which come off from the spinal cord, and in severe cases the coverings or the meninges of these organs, and in those types of cases their blood goes out from the blood vessels and may or may not destroy certain nerves. * * * The usual cause of herpes zoster, or shingles, is infection somewhere in the body—usually in the nose, throat, ear or teeth. It may be caused by several germs. The most frequent ones are streptococci, pneumococci and meningococci. Herpes zoster manifests itself by the patient's body being covered with many hundreds of little blisters, with a great deal of pain. The pain comes, not from the blisters especially, but from the inflammation of the spinal cord up in the neck below the base of the brain and of the enlargements of these sensory nerves which are so inflamed that blood is turned loose in there with other white cells and with swelling and with involvement of the covering. Herpes zoster in itself is one of the most frequent complications in meningococci infection, but I am unable to tell from this record what type of herpes zoster Kenneth Aspinwall had. * * *"

A fellow soldier testified that he served with deceased from July or August, 1918 until April, 1919; that during that time he observed swelling of deceased's hands and ankles; that the swelling occurred after any hard exercise, and that because thereof deceased would have to unlace his shoes; and that deceased "often complained of ankles and pain in his ears and the back of his neck".

After his discharge, various relatives and others testified that deceased had swelling in his face, hands, ankles and feet; that his finger "finally broke into an open sore"; that deceased used a cane, and a car which he used to go to and from the high school which he attended, beginning in the fall of 1919, and which was a block from where he lived; and that he complained of pains in his head.

An osteopathic physician testified that he treated deceased in November and December, 1919, and that he then had myocarditis, concerning which Dr. Vehrs, testified:

"* * * Myocarditis is always due to an infection somewhere in the body. It is generally inflammation of the heart muscle with a breaking down of the muscle itself so that it becomes weak and unable to take care of the usual demands upon it made by the common exercises, like eating, working, playing, walking, anything."

Dr. Vehrs further testified in answer to the hypothetical question mentioned above, that in his opinion, deceased from the time of his discharge to his death suffered from myocarditis and arthritis.

On June 1, 1920, deceased, his mother and his two sisters left Salem, Oregon destined for Alabama, by automobile. In twenty two days they arrived in Grand Junction, Colorado. Thereafter they abandoned their automobile at Wheatley, Kansas to make the rest of the journey by train. They arrived in Memphis, Tennessee about July 15, 1920; deceased was admitted to a hospital there on July 16, 1920, and in less than 24 hours was moved to another hospital where he died at 1:35 a. m. on July 18, 1920 of "acute cerebro-spinal meningitis" of "meningococcus" type.

We think this was sufficient evidence to take the case to the jury. Cf. United States v. Thompson, supra.

■ With respect to the instruction that the jury should not consider the delay, it appears that deceased made a claim for compensation for disability on May 15, 1920. Since he claimed to be disabled then and appellees claimed it in 1929 when they submitted a claim for the insurance, appellees argue that they did not know of their rights until 1929. Under Lumbra v. United States, 290 U.S. 551, 560, 54 S.Ct. 272, 276,

78 L.Ed. 492, the rule is established that where the insured is making the claim, the long delay is strong evidence that he was not permanently and totally disabled "in the absence of clear and satisfactory evidence explaining, excusing, or justifying it." In that case the insured had kept his policy in force by the payment of premiums until May 31, 1919. It does not appear when he made claim for insurance benefits, but he filed action to recover such benefits on November 30, 1931, approximately twelve and one half years after lapse of the policy, claiming to have been permanently and totally disabled during that time. His right to recovery depended upon that fact, and if anyone knew of his rights under the policy, he did. Here we do not have a case where the insured or the beneficiary is claiming that the insured was disabled for ten years, but a case where a beneficiary and a personal representative of the insured, assert that the insured was disabled for the period of one year immediately prior to his death, which occurred ten years prior to the assertion of the instant claim. We think that under the facts here shown, the error was not one requiring reversal.

■ With respect to the requested instructions, and the instruction given, regarding neglect of insured's condition, and incurability of his disability, appellant contends "that a temporary or curable condition existing before lapse but developing into a permanent or incurable condition after lapse through failure to take proper treatment or through neglect of his condition on the part of the insured may not be accepted as evidence that the condition was permanent from the beginning". See Deadrich v. United States, 9 Cir., 74 F.2d 619. There was testimony here, however, that upon treatment, deceased "might have gotten well and he might not have gotten well." Dr. Selling, for appellant, testified: "Myocarditis might extend over a long period of time and unless treated by frequent rest periods would continue indefinitely. Some of the cases get entirely well and some do not". He also testified: "If you had a swelling of the feet that was due to a myocarditis that never cleared up, even at rest, of course it would be a severe case". There was considerable testimony of the great deal of rest which insured obtained even to the point where he would lie down and sleep four or five times daily.

We believe the court was right in the instruction given, for the premise thereof was that if the jury found that insured "was permanently and totally disabled upon June 30, 1919" then he was not required to take treatment. In such case there is no "temporary" disability to treat. Likewise, the instructions requested, we think were substantially given in the following instruction of the court:

" * * * It is true that you may take into consideration whether he was permanently and totally disabled in view of his attitude toward taking care of himself and consulting a doctor. You might reasonably believe that owing to the fact that he did not consult a doctor or that he did not take treatment that he was not very sick, and that might be a logical deduction. * * *"

■ Finally, the instruction that it was immaterial what affliction caused deceased's death, is challenged, but we see no error in the instruction. Appellant complains that the instruction was erroneous in that if the insured died from some disability which he did not have on June 30, 1919, it would be a material matter for the jury in determining whether the disability was permanent. The instruction is subject to no such complaint, we believe. The effect of the instruction was that if the deceased was permanently and totally disabled on June 30, 1919, and during the period until his death, then the actual cause of death was immaterial. We think the instruction was correct. Finding no error affecting the substantial rights of appellant, 28 U.S. C.A. § 391, the challenged judgment is affirmed.