**PASADENA RESEARCH LABORATORIES, Inc., et al. v. UNITED STATES.**

No. 11690.

Circuit Court of Appeals. Ninth Circuit.

July 16, 1948.

Writ of Certiorari Denied Oct. 25, 1948.

See 69 S.Ct. 83.

Before GARRECHT, MATHEWS and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

The appellants were found guilty on five counts of an information charging violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq., hereinafter referred to as the Act, in that they "did * * * unlawfully cause to be introduced * * * into interstate commerce" adulterated and misbranded drugs. The corporate appellant was fined $3,000, and the appellant Bavouset was placed on five years' probation, imposition of sentence upon him having been suspended.

The trial was without a jury, a jury trial and special findings of fact having been specifically waived in writing.

### 1. The Facts

#### (a) "Indoform"

It was stipulated as to Counts I and II that a number of vials of "Indoform" were shipped by the appellants on or about September 17, 1945, from Pasadena, California, to Dr. Joseph C. Bunten, Cheyenne, Wyoming. One vial was picked up as a sample by Ralph M. Davidson, a Federal Food and Drug Inspector, on or about January 24, 1946, from Dr. Bunten, and was sealed and mailed to the Food and Drug Administration at Washington, D. C., hereinafter referred to as the Administration.

The vials carried labels announcing that each cubic centimeter of the drug contained three International Units of posterior pituitary and one grain of "thyroid substance."

On February 18, 1946, Arnold E. Mason, at that time employed by the Administration as pharmacologist and analyst, examined the contents of the sample vial. He testified that he "found practically no posterior pituitary in that product, an almost immeasurable quantity." After conducting the test, Mason replaced the bottle into a locked refrigerator until the next day, when he wrapped it and put a seal on it. The vial was sent to San Francisco, according to his testimony.

Mason was asked hypothetical questions, objected to by the appellant, as to whether the drug had contained three international units on the date of shipment, September 17, 1945. The questions assumed that the product had not been exposed to the "destructive temperature" of 212 degrees, had been handled in "a normal and careful manner," and had been tested as Mason had already stated on the stand. Mason answered that it was his opinion that on the date in question "there was a quantity of posterior pituitary which was not measurable by the standard methods of measuring it, or there was none."

On March 27, 1946, Andrew G. Buell, a chemist for the Administration, stationed at San Francisco, broke Mason's seal on the paper wrapper around the vial and examined the product for "thyroid content." He testified that "There was no thyroid present whatsoever." After he made his examination, he "immediately" put his seal on the bottle. The seal was dated March 28, the day after he examined the contents.

#### (b) The Deficient Pluri-B

As stipulated, a number of vials that form the basis of Counts III and IV were shipped by the appellants to Dr. Clement Swaim, Reno, Nevada, on July 16, 1945. Inspector Frank A. Griebling, of the Administration, picked up two of these vials, which contained Pluri-B, from Dr. Swaim, on August 30, 1945.

The inspector sealed the vials and contents with official seals, and forwarded them by mail to the Vitamin Division of the Administration at Washington.

Hubert H. Capps, a chemist of the Administration, examined one of the vials on September 24, 1945. Although the label on

the vial sets forth that this "Sterile Solution of Pluri-B" contains 50 milligrams of Thiamine Hydrochloride, per cubic centimeter, Capps testified that he found it contained approximately only 33 milligrams per cc.

The Government chemist also stated that at the time he received the vial, it had the same cap that it had at the time when he was testifying, "or one very similar to it," adding that "since this does not appear to be broken, I think that. it did have that identical cap." He also said, however, that he did not make any examination of the cap to determine whether or not it was punctured in any way, "other than just looking at it."

During the direct examination of Capps, he was asked the following hypothetical question, which the appellants contend was improper because it assumed facts none of which "are supported by any evidence whatever":

"Now, assuming that the product received ordinary and reasonable care, and was not exposed to excessive heats, such as heats any more than would be normal from shipping and the weather, and basing upon what you found on September 24, 1945, the amount of the B–1 or thiamine chloride that you found, have you an opinion as to what percentage or what amount that product, substance, or solution had on or about July 16, 1945, the date it was originally shipped?"

Capps replied that he believed that it did not contain more than 33 milligrams of thiamine hydrochloride per cubic centimeter.

### (c) The Contaminated Pluri-B

According to the stipulation, a number of vials with labels, which form the subject-matter of Count VII, were shipped by the appellants on June 18, 1946, to Dr. P. M. Ryerson, Phoenix, Arizona. The vials contained "Pluri-B," and, according to the labels, the contents were "for intramuscular or intravenous use."

On or about July 12, 1946, Maurice P. Kerr, an inspector for the Administration, collected a sample consisting of six vials and their contents, each at random from different boxes of the shipment in Dr. Ryerson's possession. The inspector marked the labels, sealed the vials with official seals, and forwarded them by express to the Administration at Washington.

Dr. Frank H. Wiley, chief of the chemical section of the medical division of the Administration, holding a doctor's degree in biochemistry, testified that he received the sample on July 23, 1946. He put the vials up to a light and found "with the naked eye" that all six of them "were very badly contaminated with undissolved material."

Dr. Wiley was asked the following hypothetical question, which the appellants assert was "bad and improper because it did not include a sufficient factual basis to support an opinion":

"Q. * * * Dr. Wiley, taking the two vials, * * * which I understand you examined about six weeks after the shipment in question here, from your knowledge of sterile solutions and from your observation of sterile solutions, your experience, are you able to express an opinion to this court as to whether or not the contents of those two vials, * * * did contain the undissolved particles you noticed there then as of the date they were shipped, namely, on or about June 18, 1946? Your answer is yes or no. A. Yes.

* * * * * *

"Q. * * * Will you please relate your opinion?"

The appellants object that in the foregoing questions "no mention whatever was made of the conditions to which the drug had been subjected after shipment by appellants."

Dr. Wiley's answer to the question was as follows:

"A. From experience with these materials and from general information of so-called supersaturated solutions, of which this is an example, I would say that this undissolved material was undoubtedly present on June 18th when the material was shipped. There is only one external factor of which I know that would hasten or increase the crystallization of this material, and that would be refrigeration. I doubt very much if the mail bag in which this

material was transmitted to Washington was in a refrigerator car."

The appellants comment that "even if the question was proper Wiley's opinion given in response thereto is not entitled to any weight whatever."

Other evidence relating to the drugs in question will be referred to in appropriate places in the discussion that follows.

## 2. The Canon of Construction

■ The Act is remedial, and should be liberally construed so as to carry out its beneficent purposes.

In United States v. Dotterweich, 320 U. S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48, the Court said of this statute:

"The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. [Cases cited]"

As we will point out hereafter, we are here being asked to accept defensive refinements that we believe are as gossamer-like as the traditional "shadow of a shade" of the ancient legal commentators. We have recently had occasion to construe this same statute and have endeavored to do so in the liberal spirit commanded by the Supreme Court. Research Laboratories, Inc., v. United States, 9 Cir., 167 F.2d 410, 421. In the instant case, we do not feel disposed to depart from that same generous norm of interpretation, which we believe accords with public policy and with the spirit of the law itself.

## 3. The Government's Burden and the Appellate Function

The appellants seem to be laboring under a fundamental misconception regarding (1) the degree of proof required from the appellee and (2) the duty of this court in the evaluation of the evidence. Because these misapprehensions are basic, we will endeavor to clear them away at the outset.

### (a) "Reasonable" versus "Possible" Doubt

■■ While the appellants professedly recognize the rule that the Government must prove its case beyond a *reasonable* doubt, their briefs are replete with expressions which seem to indicate that in reality the standard actually insisted upon is that the appellee's evidence should remove all *possible* doubt.

For example, we are twice told that "The Government failed to eliminate the possibility of the drugs having lost their strength * * * or having undissolved material formed or introduced in it * * * between the dates of shipment and the dates of the Government tests." Again, after enumerating many dire vicissitudes through which the drugs in question might have passed—such as improper handling, the use of hypodermic needles containing certain chemicals, and the like—the appellants suggest: "Anyone of the above things *may* have occurred even while in the inspector's hands, or during shipment by the inspector to Washington, D. C." [Emphasis supplied]

Elsewhere we find a variation of the same theme: "Furthermore, there was no evidence *precluding the possibility* that the drugs became adulterated and misbranded *at some time* after they had been shipped by appellants from Pasadena, California." [Emphasis supplied] Finally, in the reply brief we find the statement that "still the Government cannot prevail because the Government introduced no evidence to show that any of the above things did not happen."

While in other portions of their briefs the appellants do complain that the Government failed to adduce certain affirmative evidence, their insistence also upon the lack of *negative* evidence indicates that they are holding the appellee to too strict a standard of proof; namely, the proof of several negatives.

In Henderson v. United States, 9 Cir., 143 F.2d 681, 682, we said:

"The proof in a criminal case need not exclude all doubt. If that were the rule, crime would be punished only by the criminal's own conscience, and organized socie-

ty would be without defense against the conscienceless criminal and against the weak, the cowardly and the lazy who would seek to live on their wits. The proof need go no further than reach that degree of probability where the general experience of men suggests that it has passed the mark of reasonable doubt."

See also Rose v. United States, 9 Cir., 149 F.2d 755, 759.

### (b) The Weight of the Evidence

■ In the second place, the appellants' briefs contain frequent references to the *weight* of the evidence. For example, complaint is made that "The finding of guilty by the Trial Court is, therefore, contrary to the weight of the evidence" ; that certain allegedly contradictory testimony by Mason "does nothing more, it is submitted, than detract from the weight of any of Mason's testimony" ; that "the findings of guilty by the Lower Court are contrary to the weight of the evidence" ; that "Mason was biased and gave contradictory testimony" ; and that "the best evidence is the testimony of Bavouset," etc.

While as to this question, too, the appellants elsewhere in their briefs assert a *total* lack of evidence to support the Government's case, their constant insistence on the irrelevant question of the *weight* of the evidence indicates that a certain confusion on this subject exists in their minds.

To clarify the matter for once and for all, we wish to restate plainly that this court is not concerned with the *weight* of the testimony adduced below. "Questions of credibility were for the trial court." Newman v. United States, 9 Cir., 156 F.2d 8, 10, certiorari denied sub. nom. Cain v. United States, 329 U.S. 760, 67 S.Ct. 115, 91 L.Ed. 655.

### (c) The Presumption Supporting the Trial Court's Judgment

■ As a corollary to the above proposition, there need be only briefly mentioned the equally familiar doctrine relative to the weight that even in a criminal case should be given to the judgment or the verdict in the trial court. The rule, with its necessary implications, was thus succinctly stated by this court in Henderson v. United States, supra, 143 F.2d at page 682:

"It is a familiar principle, which it is our duty to apply, that an appellate court will indulge all reasonable presumptions in support of the rulings of a trial court and therefore that it will draw all inferences permissible from the record, and in determining whether evidence is sufficient to sustain a conviction, will consider the evidence most favorably to the prosecution. [Cases cited] "

### 4. The Identity of the Samples

■ The appellee "has no quarrel" with the proposition that the burden is on the Government to establish that in reasonable probability the testimony of its witnesses regarding the condition of the drugs as of the date of analysis substantially reflects their condition on the date of shipment.

The controversy between the parties arises in the application of this familiar principle to the facts at bar. The appellants seem to insist on what would amount to a mathematical demonstration that there was no tampering with the vials anywhere along the line, from the date the products left the custody of the appellants to the date when the drugs were examined and analyzed in Washington or San Francisco. The appellee, on the other hand, asserts that it has undertaken "to establish the identity of the samples *as of the time of shipment,* by circumstantial evidence relating to their interstate shipment, the identity of the consignees and the condition of the drugs when received by the Government chemists, together with the reasonable inferences flowing from such evidence."

We will now examine these divergent assertions in greater detail.

### (a) "The Chain of Possession"

■ The appellants contend that the opinions of the Government's witnesses, based on tests made after the drugs had been shipped to Washington are "absolutely worthless because the expert witnesses had no knowledge that the alleged adulteration or misbranding did not occur enroute to the doctor's office, or in the doctor's office, or in the hands of the Government inspectors who picked up the drugs, or en-

route to Washington, D. C., when shipped there by the Government inspectors."

Carried to its logical conclusion, this "chain of possession" theory would require the Government to prove affirmatively that *each* one of the many mail clerks, Administration clerks and experts, doctors, nurses, express company employees, "and others," handled and cared for the goods so that changes could not occur while the drugs were in their custody. It must also be shown that the products "were not tampered with," say the appellants.

Such a rigorous exaction regarding proof is supported neither by reason nor by authority. If the Government were obliged to establish the absence of "tampering" by every one who had any contact whatsoever with the drugs, the Act would be incapable of enforcement.

In Lestico v. Kuehner, 204 Minn. 125, 283 N.W. 122, 125, the court derided "the unique theory" that it was incumbent to show the "chain of possession" of a punctured tire casing offered in evidence after it had been repaired, "during the whole period from accident to trial." The court said:

"The tire had been removed and repaired in Minneapolis. The thought of objections and sustaining rulings was that no sufficient foundation could be laid except by testimony not only as to genuineness, but also the absence of tampering, from every person through whose hands the casing had passed in the meantime.

*"There is no such rule and never has been."* [Emphasis supplied]

In quoting authorities to support their position, the appellants significantly omit two pertinent passages from their excerpts. From the opinion in United States v. S. B. Penick & Co., 2 Cir., 136 F.2d 413, 415, they delete the following sentences:

"But there is no hard and fast rule that the prosecution must exclude all possibility that the article may have been tampered with. [Citing Lestico v. Kuehner, supra.] * * * Here the samples were taken in the ordinary course of business for the very purpose of being retained as samples; they were put in the usual place where samples were kept to remove them from accident or meddling and there they remained, so far as appear[s], undisturbed. We think this showing was sufficient to justify admission in evidence of the bottles and their contents and that it was for the jury to decide how likely it was that some other substance had been substituted for what was originally put in the bottles. [Cases cited]"

Similarly, the appellants omit the following sentences from the very middle of their quotation from 32 C.J.S., Evidence, § 607, at pages 457, 458:

"However, it is not necessary that the article be identically the same as at the time in controversy. It is unnecessary to show an absence of tampering on the part of every person through whose hands the article has passed; as long as the article can be identified it is immaterial in how many or in whose hands it has been. A direct statement that the article was in the same condition at the time of an occurrence as at a subsequent time is not required if it sufficiently appears that it must have been in substantially the same condition."

(b) The Presumption of Regularity

██ Buttressing the natural and reasonable inferences that may be drawn from the stipulations and the testimony regarding the marking, sealing and opening of the vials in question, there are certain well-established presumptions regarding the regularity not only of the acts of public servants but also of the acts of private individuals.

I. Of the Acts of Public Servants

In United States v. Chemical Foundation, 272 U.S. 1, 14, 15, 47 S.Ct. 1, 6, 71 L.Ed. 131, the familiar rule as to the acts of public officers is thus stated:

"The presumption of regularity supports the official acts of public officers, and *in the absence of clear evidence to the contrary,* courts presume that they have properly discharged their official duties. [Cases cited" [Emphasis supplied] [1]

---

[1] See also Bowles v. Glick Bros. Lumber Co., 9 Cir., 146 F.2d 566, 571, certiorari denied 325 U.S. 877, 65 S.Ct. 1554, 89 L.Ed. 1994; Dunn v. Ickes, 72 App.D.C. 325, 115 F.2d 36, 37, n. 8, certiorari denied 311 U.S. 698, 61 S.Ct. 137,

In the instant case, this presumption of official regularity would apply not only to the methods used by the Government chemists and analysts in handling the vials, but also to the care and to the absence of tampering on the part of the postal employees through whose hands the shipments passed. Boerner v. United States, D.C.N.Y., 30 F.Supp. 635, 637, affirmed, 2 Cir., 117 F.2d 387, certiorari denied 313 U.S. 587, 61 S.Ct. 1120, 85 L.Ed. 1542.

## II. Of the Acts of Private Individuals

 While the appellants reluctantly concede that there "may" be a presumption supporting the official acts of public servants, they insist that "there is no presumption whatever" with respect to "shippers", doctors, nurses, "and others."

We do not agree.

In United States Bank v. Dandridge, 25 U.S. 64, 69, 70, 12 Wheat. 64, 69, 70, 6 L.Ed. 5521, Mr. Justice Story said:

"By the general rules of evidence, presumptions are continually made, in cases of private persons, of acts even of the most solemn nature, when those acts are the natural result or necessary accompaniment of other circumstances. In aid of this salutary principle, the law itself, for the purpose of strengthening the infirmity of evidence, and upholding transactions intimately connected with the public peace, and the security of private property, indulges its own presumptions. It presumes, that every man, in his private and official character, does his duty, until the contrary is proved [cases cited]; it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption, according to the maxim, omnia presumuntur rite et solemniter esse acta, donec probetur in contrarium."

This early decision and the doctrine that it enunciates were referred to with approval in International Shoe Company v. Federal Trade Commission, 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431, where reference was made to "the familiar presumption of rightfulness which attaches to human conduct in general." [2]

This presumption that even private individuals do their duty and exercise due care should apply a fortiori to doctors and nurses, whose professional training and traditions teach them to be meticulous in the handling of preparations that are to be administered to their patients.

Indeed, in the instant case, this presumption is supported by the affirmative testimony of one of the appellants' own witnesses. Dr. Roland N. Icke, director of research at the appellants' laboratories, said while under cross-examination:

"Q. * * * It has been your practice and observation of most doctors that they try to keep their bottles in proper places, has it not, Doctor? A. I believe most of them do; yes.

"Q. And it is rare that you find a doctor but what he adheres to the cautions that he has been instructed; isn't that correct?" A. Yes."

The appellants have not pointed out, nor have we been able to find, a single scintilla of evidence in the record to indicate that any of the vials were mishandled by a single postal clerk, expressman, doctor, nurse, Government analysts, Administration mail clerk, or *any one else* who had any connection with the sealing, labeling, consignment, transmission, unwrapping, unsealing, or testing of the products in question.

The only suggestions of mishandling are in the form of *dire possibilities* conjured up by resourceful counsel. But possibilities are not proof.

## 5. The So-Called "Disclaimer"

### (a) Should "Thyroid Substance" Contain Iodine?

 It will be recalled that, although the label on the vials of "Sterile Indoform" announced that each cubic centimeter of the contents carried one grain of "thyroid substance," Buell, the Administration's chemist, found "no thyroid present whatsoever."

The appellants seek to avoid the impact of Buell's testimony by pointing out that,

85 L.Ed. 452; Middlesboro Liquor & Wine Co., Inc., v. Berkshire, 77 U.S.App. D.C. 88, 133 F.2d 39, 42.

[2] See also Powell Bros. Truck Lines v. Piatt, 10 Cir., 92 F.2d 879, 880; 31 C.J.S., Evidence, § 150e, page 840.

according to his own statement, the only thing that he examined the product for "was for the therapeutically active ingredients of thyroid, which were the organically combined iodine products." In other words, he examined "only for iodine."

Buell also testified, however, that the label statement regarding "thyroid substance" means that each cubic centimeter contains "one grain of the active constituent of the thyroid," "as organically combined iodine." "The activity of thyroid," he explained, "depends on the organically combined iodine present in the thyroid."

The appellants freely admit that there never was any iodine in "Indoform." They point to Buell's own testimony, however, that there would be present in a thyroid gland "other things" besides iodine. From this the appellants argue that the words "thyroid substance" do not necessarily imply that the preparation contains iodine.

### (b) At Best the Label Tells Only a Half-Truth

The appellants seek to bolster up this argument by pointing out that the label itself contains the notation:

"This preparation does not contain any known therapeutically useful constituent."

Since iodine is a therapeutically useful ingredient, they say, the label itself indicates that iodine is not present.

There are two answers to this argument. In the first place, this so-called disclaimer itself is untruthful. The appellant Bavouset himself admitted on the stand that posterior pituitary, which, as we have seen, is one of the ingredients of "Indoform," *does* have therapeutic value. He also testified that he "didn't manufacture" whole ovarian, another constituent, to be a meaningless product. The appellants seek—without avail, we think—to weaken the effect of this testimony by Bavouset's later lame and somewhat cryptic explanation that "In this particular solution, this form would not be measurable." In any event, we cannot say that the court erred if it believed from the evidence—as we do—that pos-

terior pituitary and whole ovarian *do* have some therapeutic value.

Assuming, however, for the sake of the argument, that the "disclaimer" does tell the truth, it cannot cure the vice of the half-truth or equivocation in the use of the expression "thyroid substance" in a preparation that contains no iodine. Section 321(n) of 21 U.S.C.A. provides that *omissions* as well as representations shall be taken into account in determining whether the labeling is misleading.

In Research Laboratories v. United States, supra, 167 F.2d at page 418, we held that "the scientific half-truths in the labeling alone make out a case of actionable misbranding."

Specific reference to self-contradictory labels is found in H. N. Heusner & Son v. Federal Trade Commission, 3 Cir., 106 F.2d 596, 597:

"Accordingly, the petitioner, a Pennsylvania manufacturer of cigars which contain only Pennsylvania tobacco, but are branded 'Havana Smokers', has been ordered to cease and desist from using the word 'Havana' to designate its product. We are asked to modify this order so as to permit the retention of the word 'Havana' with an appropriate 'qualification', i. e., the legend: "Notice. These Cigars are made in the United States and only of United States tobacco.'

"The difficulty of petitioner's position lies in the fact that the implication of the word 'Havana' is totally false. *The purchaser can be guided by either label or legend, but not by both."* [Emphasis supplied.] [3]

So here, the purchaser of "Indoform" could be guided by either the labeling "thyroid substance," which implies the presence of a therapeutic ingredient, or by the "disclaimer" of the presence of *any* such ingredient. Obviously, the implication of presence and the negation of presence cannot both be true.

In the language of the day, this "Indoform" label strikes us as a bit of scientific "double-talk."

[3] See also El Moro Cigar Co. v. Federal Commission, 4 Cir., 107 F.2d 429, 431; Progress Tailoring Co. v. Federal Trade Commission, 7 Cir., 153 F.2d 103, 105.

The Supreme Court has repeatedly denounced equivocation and evasion by those who come within the reach of a statute that enunciates Governmental policy. Whether the subterfuge is accomplished by suppression or contradiction, the vice is the same.

Referring to the Food and Drugs Act of 1906, 21 U.S.C.A. § 1 et seq., the Supreme Court, in United States v. 95 Barrels of Vinegar, 265 U.S. 438, 442, 443, 44 S.Ct. 529, 531, 68 L.Ed. 1094, used the following language:

"The statute is plain and direct. Its comprehensive terms condemn every statement, design, and device which may mislead or deceive. Deception may result from the use of statements not technically false or which may be literally true. The aim of the statute is to prevent that resulting from indirection and ambiguity, as well as from statements which are false. It is not difficult to choose statements, designs, and devices which will not deceive. Those which are ambiguous and liable to mislead should be read favorably to the accomplishment of the purpose of the act."[4]

So here, it would have been "not difficult to choose statements" that would not deceive. The simple legend, "This preparation does not contain iodine," would have been sufficient.

6. The Hypothetical Questions

The appellants object to certain hypothetical questions that were propounded to three of the Government's experts. These questions have already been quoted by us, either verbatim or in substance, in our outline of the facts.

(a) The Questions Presented Sufficient Facts in Evidence

The appellants' first two attacks upon these hypothetical questions may be considered together. They are (1) that the question addressed to Dr. Wiley did not contain sufficient facts to afford ground for a reasonable conclusion or opinion, and (2) that the question asked of Mason and Capps assumed facts not in evidence.

From the facts already stated, supplemented by the reasonable inferences flowing therefrom and by the presumptions of regularity that, as we have seen, are firmly recognized in the law, it is clear that the hypothetical questions referred to were not objectionable. We need not labor the factual aspects further.

Moreover, it should be remembered that the rule requiring a factual basis for a hypothetical question is not applied with iron rigidity.

In Permanente Metals Corporation v. Pista, 9 Cir., 154 F.2d 568, 569, we said:

"Moreover, it has been held in California, as elsewhere, that where a witness answers a hypothetical question not founded on all the facts of the case, the defect goes not to the competency of the evidence but merely affects its weight."

And in the earlier case of Travelers Ins. Co. v. Drake, 9 Cir., 89 F.2d 47, 50, this court used the following language regarding the factual latitude that might be allowed:

"The question may be framed upon any theory of the interrogator, which can reasonably be deduced from the evidence; any assumptions may be indulged on any fact within the evidence, upon which opinion is desired by the interrogator; and facts not deemed material may be omitted. [Many cases cited.] The truth of facts assumed by the hypothetical question as within the probable range of the evidence, as a basis to support the hypothetical question, is a question of fact for the determination of the jury to find with the other submitted facts upon a fair submission of the issue, and it must determine whether the basis upon which the hypothetical question rests has been established. [Authorities cited.] When the question assumes a state of facts which the evidence directly, fairly and reasonably tends to establish, and does not transcend the range of the evidence, it is not objectionable. [Cases cited.]"[5]

4 See also Donaldson v. Read Magazine, 333 U.S. 178, 188, 189, 68 S.Ct. 591.

5 See also Moyer v. Ætna Life Ins. Co., 3 Cir., 126 F.2d 141, 144.

## (b) The Questions Did Not Deal With "Ultimate Issues"

The appellants further urge that all the hypothetical questions violated the "rule of law" "excluding the opinions of experts as to the ultimate issues of fact to be determined."

This objection is not well grounded. A glance at the questions discloses that in none of them is there any reference to "misbranding" or "adulterating," which are the ultimate issues in this case. Dr. Wiley was asked whether he thought that the two vials of Pluri-B contained the undissolved particles on June 18, 1946, the date on which they were shipped. The question addressed to Mason was whether the "Indoform" contained three international units of posterior pituitary on September 17, 1945. The hypothetical question directed to Capps related to the amount of thiamine hydrochloride in the Pluri-B on the date when it was shipped by the appellants, July 16, 1945.

All these questions dealt with *supporting* or *evidentiary* facts, and not ultimate issues. It is true that the facts inquired about were *related* to the ultimate issues; else the hypothetical questions would have been irrelevant, and the appellants would now be clamoring that the questions were improper on the ground of immateriality.

In Travelers Ins. Co. v. Drake, 9 Cir., supra, 89 F.2d at page 49, this court said:

"While the jury is the sole judge of the facts as to the issue of death and cause of death, that does not, however, make objectionable the opinion of a medical expert in aid to the jury to find the ultimate fact. [Many cases cited.]"[6]

Furthermore, this court has repeatedly held that the fairness of a hypothetical question is largely a matter that lies within the discretion of the trial judge.[7]

## (c) The Trial Judge Is Presumed To Consider Only Competent Evidence

Even if certain deficiencies had crept into any of the hypothetical questions—which we most certainly do not concede—in this and in other circuits it is presumed that the trial judge considered only competent evidence in arriving at his judgment.

In Hoffman v. United States, 9 Cir., 87 F.2d 410, 411, we said:

"This case was tried by the judge and presumably he would consider only material and competent testimony."[8]

## 7. The Appellants' Admitted Lack of Testing Equipment

Capps said on the stand that he tested the contents of one of the vials in evidence for thiamine hydrochloride, and that he used a "Thiachrome procedure." This test was made on September 24, 1945.

Immediately following Capps as a witness was the appellant Bavouset. The latter was cross-examined at some length regarding a hearing of the Administration conducted by a Mr. Rowe on November 7, 1945. The record shows the following:

"Q. And did you not likewise state to Mr. Rowe at the hearing on or about November 7, 1945, with regard to the Pluri-B and the thiamine deficiency, that you did not have the equipment to make the thiachrome determination for thiamine and that you would have to, therefore, revise your manufacture and procedure? A. We did not have the equipment. Now, about the revision of manufacturing procedure, that goes on almost every day."

The appellee refers to this lack as constituting "poor manufacturing controls."

---

[6] See also Francis v. Southern Pacific Company, 10 Cir., 162 F.2d 813, 817, affirmed 333 U.S. 445, 68 S.Ct. 611; United States v. 7 Jugs, etc., of Dr. Salsbury's Rakos, D.C.Minn., 53 F.Supp. 746, 760.

[7] Travelers Ins. Co. v. Drake, 9 Cir., supra, 89 F.2d at page 50; United States v. Aspinwall, 9 Cir., 96 F.2d 867, 869; Permanente Metals Corporation v. Pista, 9 Cir., supra, 154 F.2d at pages 569, 570. Cf. Moyer v. Ætna Life Ins. Co., 3 Cir., 126 F.2d at page 144.

[8] See also United States v. David, 7 Cir., 107 F.2d 519, 522; Murray v. United States, 8 Cir., 117 F.2d 40, 45; Gates v. United States, 10 Cir., 122 F. 2d 571, 578, certiorari denied 314 U.S. 698, 62 S.Ct. 478, 86 L.Ed. 558; Daniel v. United States, 8 Cir., 127 F.2d 1, certiorari denied 317 U.S. 641, 63 S.Ct. 33, 87 L.Ed. 517.

In resisting this charge, the appellants, in their reply brief, run into another admission:

"When the Government uses the term 'poor manufacturing controls' it undoubtedly refers to the *fact* that appellants did not always test their products at the conclusion of the manufacture." [Emphasis supplied]

All this, we think, further supports the trial court's judgment that the appellants' products in question were so deficient or contaminated as to result in a violation of the Act.

## 8. Conclusion

While in the foregoing discussion we have copiously referred to the transcript, we have not attempted to give a complete summary of the evidence. To have done so would have unduly lengthened this opinion.

Our careful study of the entire record, however, has convinced us that there was no error in the judgment below, and it is accordingly affirmed.